**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 31 1997**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

BENJAMIN ALEX SMITH,

Defendant-Appellant.

No. 96-1245

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 95-CR-448-S)**

---

Submitted on the briefs.[*]

Henry L. Solano, United States Attorney, and Gregory C. Graf, Assistant United States Attorney, Denver, Colorado, for Plaintiff-Appellee.

Nina A. Iwashko of Canges, Iwashko & Bethke, P.C., Denver, Colorado, for Defendant-Appellant.

Before **BRORBY, BARRETT** and **McKAY**, Circuit Judges.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1.9. The cause is therefore ordered submitted without oral argument.

**BRORBY**, Circuit Judge.

_____

Benjamin Alex Smith was charged by indictment and convicted of six counts of wire fraud, and aiding and abetting in violation of 18 U.S.C. §§ 1343 and 2, and one count of mail fraud, and aiding and abetting, in violation of 18 U.S.C. §§ 1341 and 2. The district court sentenced him to fifty-seven months of imprisonment on each count, all counts to run concurrently. Mr. Smith appeals both his conviction and the sentence imposed under the Sentencing Guidelines. *See* U.S. Sentencing Guideline's Manual (Nov. 1995) ("U.S.S.G.").

On appeal, Mr. Smith raises three issues. First, he alleges the evidence is insufficient to support his conviction. Second, he contends the district court erred when it increased his base level offense by two levels pursuant to U.S.S.G. § 2F1.1(b)(3)(A). Lastly, Mr. Smith challenges the district court's imposition of a four-level upward departure pursuant to U.S.S.G. § 5K2.0 based on the district court's finding the Sentencing Commission failed to consider adequately those factors contained in 18 U.S.C. § 2326, part of the Senior Citizens Against Marketing Scams Act of 1994 (hereinafter the SCAMS Act), and its particularized finding that this case fell outside the heartland of the guidelines. We exercise jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. We will address each

of these matters in turn.

I.

Mr. Smith, charged with six counts of wire fraud and aiding and abetting, and one count of mail fraud and aiding and abetting, was tried jointly with his co-defendant Elizabeth Marjorie Robertson.  Evidence introduced against Mr. Smith included the testimony of three victim-witnesses; the testimony of co-defendant Richard Steven Clark; records seized from his employer and introduced through the testimony of investigating Federal Bureau of Investigation agents; and the testimony of one agent sworn as an expert on telemarketing fraud.  The following was presented to the jury at trial.

Mr. Smith was employed by Say No Now, a telemarketing operation or "boiler room," from January 1995 through at least October 1995.  He was employed as a telephone solicitor.  As such, Mr. Smith would solicit contributions for Say No Now by making unsolicited telephone calls to potential donors.  Mr. Smith would also contact individuals who had contributed in the past, a solicitation known as a "reload."

Say No Now had obtained § 501(c)(3) status under the Internal Revenue

Code (I.R.C.) from the Internal Revenue Service based on its representations to the Service. Say No Now solicitors represented the organization to potential donors as a charity devoted to helping children stay off drugs. To further entice potential donors to contribute to Say No Now, Mr. Smith and his co-defendants would tell victims they had been selected to receive their "fair share" of $75,000 in prizes and awards to donors. Victims were told they would receive more in prizes than the value of their donations. In actuality, having contributed thousands of dollars, donors received only pencil sets, board games, figurines, and savings bonds in return. Using this "pitch," Say No Now solicitors collected over $915,000 from January 1995 through October 1995. During this time, Say No Now made only one charitable contribution of $45, and returned approximately $26,000 in awards to donors.

Say No Now specifically targeted elderly persons, a group perceived as lonely, trusting and more polite, hence less likely to hang up before the telemarketer could make his pitch. Mr. Smith's victims included Mrs. Leona Akey, an eighty-three-year-old widow living alone, Mrs. Iola Hart, a widow since 1946, and Ms. Martha Nix, an eighty-five-year-old retiree, living alone. All of these victims lived in Colorado. All were called by Mr. Smith from the Say No Now offices in Las Vegas, Nevada. Victims were directed to note a particular

claim number, actually Mr. Smith's employee number, on their checks, and to send their donations to the Say No Now office in Las Vegas immediately via United Parcel Service or other private carriers. Use of express mail both minimized the chance victims would change their minds and facilitated expeditious payment of Mr. Smith and the other solicitors. Mr. Smith was paid on a commission basis. He was the second most successful solicitor at Say No Now.

The jury convicted Mr. Smith of all charged counts. At sentencing, the district court calculated Mr. Smith's sentence as follows: Under U.S.S.G. § 2F1.1(a), the base offense level for offenses involving fraud or deceit is six. The district court then enhanced the base offense level by seven levels, pursuant to U.S.S.G. § 2F1.1(b)(1)(H), for losses of $157,525 attributable to Mr. Smith; by two levels pursuant to § 2F1.1(b)(2) for more than minimal planning and multiple victims; by two levels pursuant to § 3A1.1(b) for vulnerable victims; and by two levels pursuant to § 2F1.1(b)(3)(A) for misrepresentation that he was acting on behalf of a charitable organization, thus arriving at a total offense level of nineteen. The district court then imposed a four-level upward departure under U.S.S.G. § 5K2.0 based on a finding that Mr. Smith's conduct fell outside the heartland of the typical cases of fraudulent conduct encompassed by the guidelines. The district court specifically pointed to the congressional intent

underlying the SCAMS Act as one factor providing a basis for the departure. Thus, Mr. Smith had an adjusted offense level of twenty-three, with a guideline range of forty-six to fifty-seven months imprisonment. The district court sentenced Mr. Smith to fifty-seven months on each count, to be served concurrently.

## II. Sufficiency of the Evidence

Mr. Smith contends there was insufficient evidence presented at trial to support his convictions for six counts of wire fraud, in violation of 18 U.S.C. § 1343, and aiding and abetting, in violation of 18 U.S.C. § 2, and one count of mail fraud, in violation of 18 U.S.C. § 1341, and aiding and abetting, again in violation of 18 U.S.C. § 2. In evaluating a challenge to the sufficiency of the evidence to support a jury verdict, this court reviews the entire record *de novo* in the light most favorable to the government to determine whether a reasonable jury could find guilt beyond a reasonable doubt, based on the direct and circumstantial evidence, together with the reasonable inferences to be drawn therefrom. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Voss*, 82 F.3d 1521, 1524-25 (10th Cir.), *cert. denied*, 117 S. Ct 226 (1996). "We do not use this evaluation as a chance to second-guess the jury's credibility determinations, nor do we reassess the jury's conclusions about the weight of the evidence presented."

*United States v. Johnson*, 57 F.3d 968, 971 (10th Cir. 1995). However, the evidence supporting a jury's verdict must be substantial, raising more than a mere suspicion of guilt. *United States v. Leos-Quijada*, 107 F.3d 786, 794 (10th Cir. 1997).

To establish mail fraud, the government must prove the existence of a scheme to defraud or obtain money by means of false pretenses, representations, or promises; the specific intent to defraud; and the use of the mails in furtherance of the scheme.[2] *Pereira v. United States*, 347 U.S. 1, 8 (1954); *United States v. Kennedy*, 64 F.3d 1465, 1475 (10th Cir. 1995). The essential elements of wire fraud are a scheme to defraud and use of interstate wire or radio communications

---

[2] Section 1341 proscribing mail fraud provides in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting so to do ... deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by ... such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. §1341.

to facilitate the scheme.[3]  *United States v. Galbraith*, 20 F.3d 1054, 1056 (10th

Cir.), *cert. denied*, 513 U.S. 889 (1994).  To be liable as an aider and abettor

under 18 U.S.C. § 2, the evidence must establish a defendant associated himself

with a criminal venture; participated in the venture as something he wished to

bring about; sought by his actions to make the venture succeed; and the evidence

must establish both the commission of the offense by someone and the aiding and

abetting by the defendant.  *United States v. Hanson*, 41 F.3d 580, 582 (10th Cir.

1994).

While challenging generally the sufficiency of the evidence to sustain his

convictions, Mr. Smith raises only two specific issues on appeal.  First, he

contends the government did not present sufficient evidence from which a jury

could conclude he made false representations to Say No Now donors.  Second,

---

[3]  Section 1343 proscribing fraud by wire provides in relevant part:

> Whoever, having devised or intending to devise any scheme or
> artifice to defraud, or for obtaining money or property by means of
> false or fraudulent pretenses, representations, or promises, transmits
> or causes to be transmitted by means of wire [or] radio ...
> communication in interstate ... commerce, any writings, signs,
> signals, pictures, or sounds for the purpose of executing such scheme
> or artifice, shall be fined under this title or imprisoned not more than
> five years or both.

18 U.S.C. § 1343.

Mr. Smith claims the government failed to prove he knew Say No Now was not a legitimate charitable organization.

Mr. Smith claims the evidence did not support the mail fraud verdict because "[e]very representation he made of a material nature was, in all material aspects, true." We disagree. Three of Mr. Smith's victims testified for the prosecution. The similarities across the testimony of these witnesses indicates Mr. Smith gave the same "pitch" to potential donors. Mr. Smith represented Say No Now as a charity and told donors money sent to Say No Now would be used on behalf of children. In fact, the evidence presented at trial showed Say No Now gave only a pittance to charity, one $45 contribution from the more than $915,000 collected in the relevant ten-month period. Moreover, Mr. Smith repeatedly told donors they would get more in return from Say No Now in the form of awards than they were contributing; they would share in $75,000 in cash and prizes. But while donors were sending in checks totaling thousands of dollars, the bulk of the "awards" they received in return were little more than trinkets, *e.g.*, pencil sets, rulers, Frisbees, potato peelers, *etc.* Of the $915,000 Say No Now took in, only a little more than $26,000 was returned to donors in the form of cash awards, savings bonds, and gifts.

The record further demonstrates Mr. Smith was fully aware of the disparity between the value of the cash donations to Say No Now and the value of the awards his victims were receiving in return. An agent of the Federal Bureau of Investigation, testifying from records seized at the offices of Say No Now, provided evidence Mr. Smith made written notations about both the amount of contributions and the awards sent to named donors. One victim testified she complained to Mr. Smith about the useless trinkets she was receiving and asked for her money back. Mr. Smith's co-defendant[4] testified that Mr. Smith, like all the Say No Now solicitors, made misrepresentations to donors. Mr. Smith was well aware donors were not, in fact, getting more out of Say No Now than they were putting in, as he had promised them. We find there was ample evidence presented at trial from which a reasonable jury could conclude Mr. Smith made material misrepresentations to potential donors.

Finally, arguing from a case in the Eleventh Circuit,[5] Mr. Smith contends

---

[4] Richard Clark, another Say No Now solicitor, testified against Mr. Smith and his other co-defendant, Ms. Robertson, under the terms of a plea agreement with the government. (Vol. 12, Tr. at 759-61.)

[5] In *United States v. Brown*, 40 F.3d 1218, 1221-22 (11th Cir. 1994), *cert. denied*, 514 U.S. 1092 and 514 U.S. 1121 (1995), the Eleventh Circuit determined the evidence was insufficient to establish Mr. Kielmeyer, one of six defendants, possessed culpable knowledge and intent regarding a fraudulent insurance scheme perpetrated by a transportation service company. 40 F.3d at 1221-22. While he

the government failed to prove he knew Say No Now was not a legitimate charitable organization. *See Brown*, 40 F.3d at 1218. We read Mr. Smith's argument to be a claim the government did not sufficiently show he had culpable knowledge and intent regarding Say No Now's fraudulent scheme, an essential element of the charged offenses. In support of his contention, Mr. Smith claims he was told Say No Now was a charity, he worked from "an approved script," and he had "no criminally enforceable duty to investigate" his employer. Thus, Mr. Smith concludes, he lacked the requisite culpable knowledge and intent.

While the government must prove all elements of the charged offenses, direct proof of fraudulent intent is not necessary. *United States v. Curtis*, 537 F.2d 1091, 1097 (10th Cir.), *cert. denied*, 429 U.S. 962 (1976). Intent may be inferred from a variety of circumstantial evidence, including the defendant's misrepresentations and knowledge of false statements. *United States v. Prows*, 118 F.3d 686, 692 (10th Cir. 1997). Unlike the circumstances in *Brown*, there is ample evidence in the record to support an inference Mr. Smith was more than the innocent employee of a wrongdoer.

was on the company payroll and visited company headquarters on three to five occasions, the court found no evidence Mr. Kielmeyer was anything other than a dupe. *Id.* at 1222. The record also indicated Mr. Kielmeyer severed all ties with the scheme within two weeks of learning it might be fraudulent. *Id*.

As we have stated, the record demonstrates Mr. Smith knowingly made misrepresentations and false statements to donors. Business records seized from Say No Now indicated telephone solicitors like Mr. Smith freely exchanged information on the financial solvency and personal vulnerability of their victims, as well as strategies for overcoming objections by victims. Mr. Smith's co-defendant testified the fraudulent nature of Say No Now boiler rooms was readily apparent to telephone solicitors. In short, we are persuaded the record provides sufficient bases from which a reasonable jury could conclude beyond a reasonable doubt Mr. Smith had the requisite guilty knowledge and intent. He willfully associated himself with a fraudulent scheme and acted to further that scheme.

We have reviewed carefully the trial record and we hold there was substantial evidence to support the jury verdicts on all charges. Mr. Smith, with culpable knowledge and intent, made false representations and promises as part of a scheme to defraud and to obtain money by means of false pretenses. The jury reasonably could find Mr. Smith misrepresented both the extent of Say No Now's charitable endeavors and the value donors would receive in return for their cash contributions. We also note the record clearly shows Mr. Smith made interstate phone calls and used interstate carriers as part of the scheme to defraud.

III.  Application of U.S.S.G. § 2F1.1(b)(3)(A)

Mr. Smith argues the district court incorrectly applied U.S.S.G. § 2F1.1(b)(3)(A)[6] to enhance his base offense level by two levels.  Appellate review of a district court's application of a sentencing guideline is a two-step process.  *United States v. McAlpine*, 32 F.3d 484, 487-88 (10th Cir.), *cert. denied*, 513 U.S. 1031 (1994).  We review the district court's interpretation and application of the guideline *de novo. Id*.  After determining a guideline's scope and meaning, we review the district court's factual determinations for clear error. *Id*. at 488.  We will not disturb the district court's factual findings "'unless the court's finding was without factual support in the record, or if after reviewing all the evidence we are left with the definite and firm conviction that a mistake has been made,'" *United States v. Easterling*, 921 F.2d 1073, 1077 (10th Cir. 1990) (quoting *United States v. Beaulieu*, 893 F.2d 1177, 1182 (10th Cir.), *cert. denied*, 497 U.S. 1038 (1990)), *cert. denied*, 500 U.S. 937 (1991).


Mr. Smith claims he did not misrepresent that he was "acting on behalf of a

---

[6]  Section 2F1.1(b)(3)(A) of the Sentencing Guidelines provides a defendant's base offense level may be increased by two levels "[i]f the offense involved ... a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious or political organization, or a government agency."

charitable ... organization," pursuant to U.S.S.G. § 2F1.1(b)(3)(A). Relying on this court's opinion in *United States v. Frazier*, 53 F.3d 1105 (10th Cir. 1995), Mr. Smith contends because he had authority to act on behalf of Say No Now, an organization qualified for exempt status under § 501(c)(3)[7] of the Internal Revenue Code, his conduct is outside the scope of U.S.S.G. § 2F1.1(b)(3)(A). Mr. Smith's reliance on *Frazier* is misplaced.

In *Frazier*, the president of a nonprofit corporation that accepted grants from the United States Department of Labor was convicted of misapplying the corporation's property and making false statements to a government agency, stemming from his misuse of grant money to make unauthorized computer

---

[7] Section 501(a) of the Internal Revenue Code provides tax exempt status for organizations described in § 501(c)(3). *See* 26 U.S.C. § 501(a). Section 501(c)(3) provides in pertinent part:

> Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, ... no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation ... , and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

26 U.S.C. § 501(c)(3).

-14-

equipment purchases. *Frazier*, 53 F.3d at 1108-09. Mr. Frazier's base offense

level was enhanced by two levels pursuant to U.S.S.G. § 2F1.1(b)(3)(A). *Id.* at

1109. A divided court concluded the focus of the guideline is "exploitative

conduct which induces victims to act upon their charitable or trusting impulses

due to the defendant's misrepresentation that he has authority to act on behalf of a

charitable, educational, religious or political organization or a government

agency." *Id.* at 1113. According to the majority, as president of the nonprofit

corporation, Mr. Frazier used grant funds for unauthorized purposes, but did not

"appeal to the generosity and charitable or trusting impulses of his victim [the

United States Government] by falsely declaring that he had authority to act on

behalf of an educational organization,"[8] thus, his conduct was outside the ambit of

the guideline. *Id.* The decision in *Frazier* turned on whether Mr. Frazier

misrepresented his authority to act "on behalf of" the organization; the legitimacy

of the educational organization he headed was not at issue.[9] *Id.* at 1113. The

---

[8] In dissent, United States Circuit Judge Baldock argued the majority had focused too narrowly on whether the defendant had been acting "as a representative of" the organization. *Frazier*, 53 F.3d at 1116 (Baldock, J., dissenting). Judge Baldock concluded the "Defendant misrepresented he was acting *in the interest of* an educational agency" when he made the unauthorized computer purchase. *Id.* at 1118 (emphasis added).

[9] It was "undisputed that Defendant was president and chairman of the board of [National Indian Business Counsel doing business as United Tribe Service Center], a non-profit corporation, which was funded by the United States Department of Labor to provide employment and training opportunities for

facts of this case present a different issue of interpretation. Herein, the applicability of the guideline turns on whether the organization Mr. Smith represented was, in fact, a "charitable ... organization" as contemplated by U.S.S.G. § 2F1.1(b)(3)(A).

To determine if the facts of this case fall within the scope of the U.S.S.G. § 2F1.1(b)(3)(A), we interpret the sentencing guidelines as if they were statutes. *United States v. Gacnik*, 50 F.3d 848, 852 (10th Cir. 1995). We follow the "clear, unambiguous language of the guidelines." *Frazier*, 53 F.3d at 1111-12. We also follow the commentary in the guidelines that interprets or explains how a guideline is to be applied. *Stinson v. United States*, 508 U.S. 36, 38, 42-43 (1993). Section 2F1.1(b)(3)(A) of the guidelines provides a defendant's base offense level may be enhanced "if the offense involved ... a misrepresentation that the defendant was acting on behalf of a charitable ... organization." According to the background commentary, the guideline "enhances the sentences of defendants who take advantage of victims' ... generosity and charitable motives," noting "defendants who exploit victims' charitable impulses ... create particular social harm." U.S.S.G. § 2F1.1, comment. (backg'd. ¶ 4).

_____

American and Alaskan Indians through the [Department of Labor] grant program." *Frazier*, 53 F.3d at 1113.

Examples of conduct within the parameters of U.S.S.G. § 2F1.1(b)(3)(A) "would include a group of defendants who solicit contributions to a non-existent famine relief organization." U.S.S.G. § 2F1.1, comment. (n. 4). We conclude soliciting donations for a bogus charity is tantamount to soliciting for a non-existent charity and would support application of U.S.S.G. § 2F1.1(b)(3)(A). Affirmatively soliciting charitable contributions from the public, absent a legitimate charitable purpose, would "exploit victims' charitable impulses," precisely the aggravating circumstance the guideline is designed to address. U.S.S.G. § 2F1.1(b)(3)(A), comment. (backg'd. ¶ 4).

Mr. Smith contends Say No Now's exempt status under I.R.C. § 501(c)(3), standing alone, is sufficient to avoid application of U.S.S.G. § 2F1.1(b)(3)(A). We disagree. Since this issue does not come to us in the context of a tax dispute, this is not a case in which the Internal Revenue Service has "primary authority." *See Bob Jones University v. United States*, 461 U.S. 574, 596 (1983) ("[T]his Court has long recognized the primary authority of the IRS and its predecessors in construing the Internal Revenue Code."). However, as in the context of a tax dispute, we will not use the letter of the tax code to elevate form over substance. *See Gregory v. Helvering*, 293 U.S. 465, 470 (1935). While tax-exempt status under I.R.C. § 501(c)(3) may be *some* evidence of the character of an

organization, it does not resolve the issue as a matter of law.[10]  Whether or not

Say No Now was organized and operated as a charity for purposes of applying

U.S.S.G. § 2F1.1(b)(3)(A) was a proper question for the district court.

The district court determined Say No Now was not a "charitable ...

organization" as contemplated by U.S.S.G. § 2F1.1(b)(3)(A).  The district court

concluded Say No Now obtained § 501(c)(3) status "to give an aura of legitimacy"

to a scheme to defraud and lacked a "charitable purpose."  The district court's

conclusion is supported by the record.  From January 1995 through October 1995,

Say No Now took in over $915,000 while disbursing only one $45 charitable

contribution.  Individuals who sent money to Say No Now were not referred to as

donors, but as "mooches," a term of derogation.[11]  The district court also pointed

to Mr. Smith's "[c]lear misrepresentations to the victims," including

"misrepresentation to the victims that their donations would be sent to drug and

alcohol abuse centers."  The district court found Say No Now was a "scheme to

defraud," not a charitable organization.  We agree.

---

[10]  Mr. Smith does not dispute the government's claim the Internal Revenue Service's determination was based solely on attestations made by Say No Now.

[11]  The government's expert witness described "mooch" as  "a derogatory term used [by telemarketers] to describe the people who fall for the fraudulent pitches."

Mr. Smith further contends the district court impermissibly placed the burden of proof on him at the sentencing hearing, requiring him to prove he lacked knowledge of the true nature of Say No Now.[12] The allocation of burden of proof is a legal issue subject to *de novo* review. *United States v. Kirk*, 894 F.2d 1162, 1163 (10th Cir. 1990). Our review of the record on appeal convinces us this argument is without merit. The district court did not place the burden of proof on Mr. Smith. Mr. Smith was convicted of participating in a scheme to commit mail and wire fraud. Mr. Smith had a history of working in telemarketing boiler rooms. Mr. Smith's co-defendant testified anyone working at Say No Now for more than a few days would know it was a "scam." The district court found the government's evidence compelling. Viewed in context, the district court's observation it found "not one scintilla of evidence" to indicate Mr. Smith and his co-defendants believed the contributions they solicited went to charity was part of one last invitation to the defendants to present rebuttal evidence at the sentencing hearing, not an impermissible shifting of the burden of proof. The district court properly placed the burden of proof on the government to establish the factual elements in the presentence report. *See United States v. Reid*, 911 F.2d 1456, 1461 (10th Cir 1990), *cert. denied*, 498 U.S. 1097 (1991) (stating allocation of

_____

[12] Mr. Smith bases his claim solely on comments made by the district court to his co-defendant, Ms. Robertson.

burden of proof at sentencing).

The record demonstrates Mr. Smith misrepresented Say No Now as a "charitable organization" as part of a scheme to exploit the charitable motives of donors. The district court correctly applied U.S.S.G. § 2F1.1(b)(3)(A). We affirm imposition of the two-level enhancement.

## IV. Four-Level Upward Departure

Mr. Smith challenges the district court's imposition of a four-level upward departure pursuant to U.S.S.G. § 5K2.0.[13] Mr. Smith contends the district court erroneously relied on the Senior Citizens Against Marketing Scams Act of 1994, which enhances the penalties for individuals convicted of any of the six enumerated telemarketing offenses if the victims were over fifty-five,[14] as the

---

[13] Section 5K2.0 of the Guidelines Manual sets forth the Sentencing Commission's general policy statement on grounds for departure from the sentence range established by the applicable guideline(s). U.S.S.G. § 5K2.0.

[14] Section 2326 of the SCAMS Act provides:

A person who is convicted of an offense under section 1028, 1029 1341, 1342, 1343, or 1344 in connection with the conduct of telemarketing--
(1) may be imprisoned for a term of up to 5 years in addition to any term of imprisonment imposed under any of those sections, respectively; and
(2) in the case of an offense under any of those sections that--

basis for the upward departure. 18 U.S.C. § 2326. Mr. Smith argues the SCAMS Act does not apply to his conduct. Mr. Smith then argues, if the SCAMS Act applies, it cannot serve as the basis for an upward departure because the Act was not intended to enhance the punishment for telemarketing fraud; the Sentencing Commission determined the existing guidelines adequately addressed victim related adjustments for fraud offenses against the elderly; and the factors underlying the SCAMS Act are addressed fully by the enhancements for vulnerable victims and for multiple victims. U.S.S.G. §§ 3A1.1(b) and 2F1.1(b)(2)(B). The relationship between the SCAMS Act and the Sentencing Guidelines poses a question of first impression for this Court.

As an initial matter, Mr. Smith argues his conduct did not constitute telemarketing under the SCAMS Act, therefore its penalty provisions are

---

(A) victimized ten or more persons over the age of 55; or
(B) targeted persons over the age of 55,
may be imprisoned for a term of up to 10 years in addition to any term of imprisonment imposed under any of those sections, respectively.

18 U.S.C. § 2326 (enhancing penalties under 18 U.S.C. § 1028, "Fraud and related activity in connection with identification documents"; § 1029, "Fraud and related activity in connection with access devices"; § 1341, "[Mail] Frauds and swindles"; § 1342 "Fictitious name or address [mail fraud]"; § 1343 "Fraud by wire, radio, or television"; and § 1344, "Bank fraud").

unavailable.  We review the district court's findings *de novo*.  *See United States v. Roberts*, 898 F.2d 1465, 1468-69 (10th Cir. 1990).  The Act statutorily defines telemarketing as "a plan, program, promotion, or campaign that is conducted to induce (A) purchases of goods or services; or (B) participation in a contest or sweepstakes, by use of 1 or more interstate telephone calls."  18 U.S.C. § 2325.  Mr. Smith characterizes his activity as a "donation approach," denying there was either a "focus to sell goods or services" or an "inducement" to "participate in any contest or sweepstakes."  Based on "the totality of the circumstances surrounding the undertaking," the trial court concluded  Mr. Smith's conduct "clearly falls within the statute."  We agree.

However Mr. Smith might characterize his approach to victims, the Say No Now scheme meets the statutory requirements of the SCAMS Act.  First, Mr. Smith was convicted of two of the offenses, 18 U.S.C. §§ 1341 and 1343, enumerated in the Act.  18 U.S.C. § 2326.  Second, Mr. Smith induced more than fifty victims over the age of fifty-five to contribute to the Say No Now scheme.  *See* 18 U.S.C. § 2326(2)(A).  Third, Mr. Smith induced individuals to participate in the Say No Now scheme by use of numerous interstate phone calls.  *See* 18 U.S.C. § 2325.  Fourth, while referred to as a "charity" by Mr. Smith, the Say No

-22-

Now scheme had the constitutive elements of a contest or sweepstakes.[15]

Sweepstakes means "any of various lotteries or contests for prizes." Webster's Third New International Dictionary 2309 (1981). A contest is "a competition in which each contestant performs without direct contact with or interference from his competitors." *Id*. at 492. A lottery is "an event or affair whose outcome is or seems to be determined by chance." *Id*. at 1338. Victim testimony at trial and at the sentencing hearing indicated Mr. Smith offered his victims prizes and awards such as cars, televisions and cash bonuses as inducements to participate by sending in money to Say No Now. There also was an element of chance since individuals were not told the exact nature of the award. There was an element of indirect competition, *i.e.*, victims were told they needed to act fast to secure their awards. Ample evidence in the record supports the district court's conclusion Mr. Smith was engaged in a telemarketing scheme under 18 U.S.C. §§ 2325-26.

If the SCAMS Act applies to his conduct, and we hold it does, Mr. Smith further contends the Act cannot support an upward departure. We review the

---

[15] Even Mr. Smith characterizes the representations he made as "quite similar to the 'sweepstakes notifications'" one receives in the mail.

district court's decision to depart from the Sentencing Guidelines under a unitary abuse of discretion standard. *Koon v. United States*, ___ U.S. ___, ___, 116 S. Ct. 2035, 2046-48 (1996); *United States v. Collins*, 122 F.3d 1297, 1303 (10th Cir. 1997). A district court must impose a sentence within the guidelines unless it determines "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b). Thus, a sentencing court may depart upward from the sentence dictated by the guidelines if an aggravating circumstance is of a *kind* not adequately taken into consideration or if the factor is present to an unusual *degree*.

Mr. Smith contends the Act cannot support an upward departure for three reasons. First, he asserts the purpose of the Act was "to enhance the penalties for telemarketing fraud on the elderly, rather than to enhance the punishment of the same under the sentencing guidelines." This claim flies in the teeth of both the text of the Act and its clear intent. Senator Hatch, joined by several other senators, introduced S. 557, the Senior Citizens Against Marketing Scams Act, to combat telemarketing fraud. 139 Cong. Rec. S10015 (daily ed. July 30, 1993).

According to the committee discussion draft report on S. 557,[16] by enhancing penalties, Congress wanted to "take[] steps to ensure that all fraud related offenses against older victims are properly *punished*." *Id.* at S10016 (emphasis added). Hence, the Act instructed the Sentencing Commission "to review its guidelines to ensure that fraudulent crimes against senior citizens receive appropriate *punishment*." *Id*. (emphasis added); *see* Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 250003, 108 Stat. 1796, 2085 (1994). Clearly, Congress intended to address the punishment of, as well as penalties for, telemarketing fraud.

Second, Mr. Smith asserts the Sentencing Commission has determined the existing guidelines adequately address victim related adjustments for fraud offenses against the elderly and its determination "makes it difficult to endorse the discretionary, optional, non-guideline sentence proposed by the court" for Mr. Smith's mass victimization of the elderly. Generally, a sentencing court may not impose a sentence outside the guidelines if an aggravating circumstance has been adequately taken into consideration by the Sentencing Commission in formulating

---

[16] The Senate Judiciary Committee issued no formal report on S. 557, but Senator Hatch requested that the discussion text of the draft report be printed in the Congressional Record. 139 Cong. Rec. S10016 (daily ed. July 30, 1993).

the guidelines. 18 U.S.C. § 3553(b). Mr. Smith relies on the report issued by the United States Sentencing Commission in response to a congressional directive to review the adequacy of victim related sentencing adjustments for fraud offenses against the elderly. Report to the Congress: Adequacy of Penalties for Fraud Offenses Involving Elderly Victims (Mar. 1995) (prepared pursuant to § 250003 of the SCAMS Act, Pub.L. No. 103-322). In its report, the Commission indicated if the review process supported the need for guideline amendments, the Commission intended to submit those changes to Congress by May 1, 1995. *Id*. at 12; *see* 28 U.S.C. § 994(p)(1993) (establishing statutory deadline for proposed amendments). Since no guideline amendments were proposed, Mr. Smith interprets the Commission's inaction as endorsing the adequacy of the existing guidelines. Mr. Smith reads too much into the Commission's inaction.

The absence of action by the Sentencing Commission should not be read as a conclusive statement on the adequacy of the guidelines or as having a preclusive effect on discretionary departures by the district court. As the Commission noted in its report, issued a scant two months before the statutory deadline for amendments, the "[l]ack of consistently reported information on victim age in case files prevents a comprehensive assessment of the adequacy of guideline sentences in fraud offenses involving older victims." *Id*. at 1. Moreover, when

the Commission was consulted by the probation officer during preparation of Mr. Smith's presentence report, the Commission did not issue guidance barring consideration of the mass victimization of the elderly as grounds for an upward departure. Since there is insufficient evidence to conclude the Commission fully considered the existing guidelines and affirmatively determined their adequacy, we cannot say the district court abused its discretion by basing an upward departure on the SCAMS Act.

Finally, Mr. Smith specifically contends the aggravating aspect of the offense addressed by the SCAMS Act, mass victimization of the elderly, was already taken into account by the guideline enhancements for vulnerable victim, U.S.S.G. § 3A1.1(b), and for multiple victims, U.S.S.G. § 2F1.1(b)(2)(B), imposed by the district court.[17] The vulnerable victim guideline enhancement provides for a two-level enhancement "[i]f the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1(b). Vulnerable victims are "those who are

---

[17] Mr. Smith does not challenge directly the district court's application of the guideline enhancements for vulnerable victim and multiple victims. U.S.S.G. §§ 3A1.1(b) and 2F1.1(b)(2)(B).

in need of greater societal protection." *United States v. Brunson*, 54 F.3d 673, 676 (10th Cir.), *cert. denied*, 116 S. Ct. 397 (1995). The multiple victim enhancement increases the base offense level by two if an offense involves "a scheme to defraud more than one victim." U.S.S.G. § 2F1.1(b)(2)(B). The district court concluded the two guideline enhancements did not adequately capture aspects of the offense uniquely associated with Mr. Smith's mass victimization of the elderly. We agree with the trial court's determination regarding the vulnerable victim enhancement; the departure and the enhancement address distinct aspects of Mr. Smith's offense. However, we find the multiple victim enhancement necessarily overlaps with the mass victimization on which the departure is based in part.

The foci of the vulnerable victim enhancement and the SCAMS Act differ on two key dimensions. The SCAMS Act is directed toward criminal telemarketing conduct targeted at or actually victimizing a certain class of individuals, statutorily defined as those over the age of fifty-five. 18 U.S.C. § 2326. The Act requires the offense target the elderly as a class. In contrast, the vulnerable victim enhancement does not require a finding the defendant targeted the victim because of his vulnerability. *United States v. Hardesty*, 105 F.3d 558, 560 (10th Cir. 1997). Moreover, the vulnerable victim enhancement cannot be

based solely on the victim's membership in a certain class; the sentencing court is required to make particularized findings of vulnerability, focusing on the individual victim and not the class of persons to which the victim belonged. *Brunson*, 54 F.3d at 676; *United States v. Creech*, 913 F.2d 780, 781-82 (10th Cir. 1990). A single vulnerable victim is sufficient to support application of the enhancement. *See, e.g., United States v. Pearce*, 967 F.2d 434 (10th Cir.), *cert. denied*, 506 U.S. 922 (1992). Thus, the focus of the SCAMS Act and that of the vulnerable victim enhancement differ in key respects and are sufficiently distinct to avoid double counting the same offense conduct.

In attempting to distinguish the multiple victim enhancement under U.S.S.G. § 2F1.1(b)(2)(B) and the mass victimization of the elderly factor encompassed by the SCAMS Act, the district court concluded U.S.S.G. § 2F1.1 is loss driven, while the SCAMS Act departure is victim driven. Certainly, U.S.S.G. § 2F1.1 does increase the base offense level for a fraud offense to account for the loss caused by a defendant. U.S.S.G. § 2F1.1(b)(1)(A)-(S). However, by its terms U.S.S.G. § 2F1.1(b)(2)(B) also provides a two-level enhancement if the offense involved "a scheme to defraud more than one victim," irrespective of the

amount of loss.[18]  In interpreting the guidelines, we follow "the clear, unambiguous language of the guidelines unless there is a manifestation of contrary intent."  *United States v. Florentino*, 922 F.2d 1443, 1446 (10th Cir. 1990).  Finding no evidence of contrary intent, we must conclude the offense characteristics addressed by the guideline include both the amount of loss and the number of victims.  To the extent the upward departure is based on the number of victims, it is not supported by an aspect of the offense sufficiently distinct from that supporting the multiple victim enhancement. The district court erred in double counting this aspect of Mr. Smith's offense behavior.

When a district court bases a departure on improper grounds, the reviewing court must then determine if a remand is necessary.  18 U.S.C. § 3742(f).  The reviewing court should remand the case unless it concludes, on the record as a whole, the district court "would have imposed the same sentence absent reliance on the invalid factors."  *Koon*, 116 S. Ct. at 2053-54 (citing *Williams v. United States*, 503 U.S. 193, 203 (1992)).  Herein, the district court did not rely on the SCAMS Act as the sole basis for departure.  The sentencing court also found the

---

[18]  The background commentary to the multiple victim enhancement indicates the subsection "refers to a design or plan to obtain something of value from more than one person."  U.S.S.G. § 2F1.1 comment. (n. 3).

circumstances of this case were outside the heartland of the offenses for which Mr. Smith was being sentenced. We review this finding to determine if the district court's error was harmless. *See* Fed. R. Crim. P. 52(a).

The district court may depart from the guidelines if an aggravating circumstance exists to a degree not adequately taken into consideration by the guidelines. 18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0. A departure is permitted if aspects of the case are "found unusual enough for it to fall outside the heartland of cases in the Guideline."[19] *Koon*, 116 S. Ct. at 2046. A district court's decision to depart from the guidelines based on the unusual nature of the case is due "substantial deference" because "[w]hether a given factor is present to a degree not adequately considered by the Commission ... [is] determined in large part by comparison with the facts of other Guidelines cases. District courts have an institutional advantage over appellate courts in making these sorts of

---

[19] As the Guidelines Manual explains:

The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.

U.S.S.G. Ch. 1, Pt. A, intro. comment. 4(b).

determinations, especially as they see so many more Guidelines cases than appellate courts do." *Koon,* 116 S. Ct. at 2046-47.

In reviewing a district court's decision to depart, this Court must evaluate

(1) whether the factual circumstances supporting a departure are permissible departure factors; (2) whether the departure factors relied upon by the district court remove the defendant from the applicable Guideline heartland thus warranting a departure, (3) whether the record sufficiently supports the factual basis underlying the departure, and (4) whether the degree of departure is reasonable.

*Collins*, 122 F.3d at 1303. We apply a unitary abuse of discretion standard throughout the *Collins* analysis. *Id*.; *Koon*, 116 S. Ct. at 2047-48. Whether the factual circumstances of the case provide a permissible basis for departure is essentially a legal inquiry and our review is plenary. *Collins*, 122 F.3d at 1303; *Koon*, 116 S. Ct. at 2047. Whether the factual circumstances make the case atypical is a factual inquiry and our review is most deferential. *Collins*, 122 F.3d at 1302; *Koon*, 116 S. Ct. at 2046.

The district court departed upward from the applicable guideline range for fraud offenses. *See* U.S.S.G. § 2F1.1. In departing upward, in accordance with U.S.S.G. § 5K2.0, the district court found this case "clearly is a matter which goes beyond the heartland of the typical cases of fraudulent conduct that the guideline [U.S.S.G. § 2F1.1] describes." In reviewing an upward departure, we

-32-

ask first whether the district court has relied on permissible departure factors. *Collins*, 122 F.3d at 1303. Potential departure factors "cannot, by their very nature, be comprehensively listed and analyzed in advance." U.S.S.G. § 5K2.0. With the exception of a short list of factors,[20] the Commission "does not intend to limit the kinds of factors, whether or not mentioned anywhere else in the guidelines, that could constitute grounds for departure in an unusual case." U.S.S.G. Ch. 1, Pt. A, intro. comment. 4(b). This Court's examination of "whether a factor can ever be an appropriate basis for departure is limited to determining whether the Commission has proscribed, as a categorical matter, consideration of the factor." *Koon*, 116 S. Ct. at 2051.

The district court pointed to a combination of specific offense characteristics in support of its conclusion Mr. Smith's offense was outside the heartland of fraud cases: Mr. Smith's extreme conduct, and the personal and financial injury he inflicted on the victims. After listening to the evidence adduced at trial and proffers of proof at the sentencing hearing, including the

---

[20] Factors listed as not ordinarily relevant in sentencing determinations include characteristics such as race, sex, national origin, creed, religion and socioeconomic status (U.S.S.G. § 5H1.10); prior good works (*id.* § 5H1.11); lack of guidance as a youth (*id.* § 5H1.12); drug or alcohol dependence (*id.* § 5H1.4), *etc.*

testimony of victims, the district court found Mr. Smith's conduct was "particularly predatory." The sentencing court determined Mr. Smith's victims were psychologically, emotionally and financially devastated as a result of his offense conduct.

In reviewing whether these are permissible departure factors, we note none are among the handful of factors not ordinarily relevant in sentencing determinations. An extra measure of criminal depravity is precisely the type of factual circumstance the departure mechanism is designed to address. *See* 18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0. The Sentencing Commission has explicitly recognized "[i]n cases in which the loss determined under [U.S.S.G. § 2F1.1(b)(1)] does not fully capture the harmfulness and seriousness of the conduct, an upward departure may be warranted." U.S.S.G. § 2F1.1, comment. (n.10). Examples of circumstances in which the loss underestimates the harm include cases where "the offense caused reasonably foreseeable, physical or psychological harm or severe emotional trauma" and where "the offense involved the knowing endangerment of the solvency of one or more victims." *Id*. (n.10.(c) and (f)). Therefore, after reviewing the relevant guidelines, policy statements, and official commentary of the Sentencing Commission, we conclude none of the factors relied on by the district court as the basis for an upward departure is an

impermissible departure factor.

We then ask whether the record supports the district court's conclusion the departure factors are present to an exceptional degree. *Collins*, 122 F.3d at 1303. Trial testimony indicated Mr. Smith would ingratiate himself to victims in order to ascertain the extent of their financial resources. Mr. Smith would then take everything he could get, going so far as to take one victim's last dollar. When victims indicated there was no more money, Mr. Smith continued to call, proud of the fact these people were "mooches" who could be preyed on again and again. As a result of Mr. Smith's conduct, victims lost all their savings. One victim, an 83 year-old widow, was forced to mow lawns and clean motel rooms to get by. Mr. Smith's victims also were psychologically and emotionally harmed, suffering from depression and loss of self-esteem. The trial court determined Mr. Smith knew his victims were being harmed by their losses and he continued to victimize them. The court found Mr. Smith's conduct "significantly, massively, differs from the normal fraudulent conduct." Based on twenty years experience, the sentencing court concluded "this is probably as despicable an offense in its way as any I have ever seen." As the Supreme Court indicated, the district court has special competence to make this type of refined comparative factual assessment. *Koon*, 116 S. Ct. at 2046-47. The district court's findings are well-supported by

-35-

the record.  We cannot say the district court abused its discretion in finding the circumstances of this case atypical.

The atypicality of this case removed it from the heartland of fraud cases and provided a proper basis for a departure.  Based on the record before us, we are confident the district court would impose the same sentence on remand.  Therefore, we hold the district court's error in applying the SCAMS Act was harmless.

Where a departure is permitted, as it is here, we still must determine whether the degree of departure from the guidelines was reasonable.  *See* 18 U.S.C. § 3742(e)(3); *Collins*, 122 F.3d at 1303.  In *Williams*, the Supreme Court indicated "[t]he reasonableness determination looks to the amount and extent of the departure in light of the grounds for departing.  In assessing reasonableness ... a court of appeals [should] examine the factors to be considered in imposing a sentence under the Guidelines, as well as the district court's stated reasons for the imposition of the particular sentence."  503 U.S. at 203-04.  In *United States v. Jackson*, we held a sentencing court must explain, *inter alia*, why "that specific degree of departure is reasonable."  921 F.2d 985, 989 (10th Cir. 1990).  Thus, we consider the district court's articulated reasons for the imposition of the particular

sentence, as well as factors such as the seriousness of the offense, the need for just punishment, deterrence, and protection of the public. 18 U.S.C. §§ 3742(e)(3)(B) and 3553(a)(2).

In the instant case, the district court imposed a four-level upward departure. As detailed *supra*, the district court articulated multiple reasons for the degree of departure. The court expressly considered the factors outlined in 18 U.S.C. § 3553(a)(2), *i.e.*, seriousness of the offense, need for punishment and deterrence, protection of the public, and correctional treatment. The district court concluded Mr. Smith's was an "extremely serious offense," and he "need[ed] to be punished." The district court wanted to protect society from "predators" like Mr. Smith and enhance the deterrent effect by showing other boiler room telemarketers such activity "will not be tolerated in a civilized society."

Our review of the record establishes the degree of departure here was reasonable. We **AFFIRM** imposition of the four-level upward departure.

V

The judgment and sentence of the district court is **AFFIRMED**.