**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 4 2000**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

STEVEN MARTIN CLAYTON
DODSON,

Defendant - Appellant.

No. 99-5039

(N.D. Oklahoma)

(D.C. No. CR-98-27-C)

**ORDER AND JUDGMENT** *

Before **EBEL**, **ANDERSON**, and **MURPHY**, Circuit Judges.

Steven Martin Clayton Dodson appeals his sentence and conviction on

twenty-one counts of mail fraud, in violation of 18 U.S.C. § 1341 and § 2(b), and

one count of money laundering, in violation of 18 U.S.C. § 1957. Mr. Dodson

was acquitted of one count of perjury, in violation of 18 U.S.C. § 1621. He was

sentenced to 60 months imprisonment on each mail fraud count and 108 months

---

*This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

on the money laundering count, the sentences to run concurrently. Mr. Dodson was ordered to pay an assessment of $1,200 and restitution of $4,714,801. We affirm his conviction and sentence.

## BACKGROUND

Between April 1986 and March 31, 1994, Mr. Dodson was a registered broker-dealer agent for Dean Witter Reynolds, Inc. Dean Witter fired Mr. Dodson on March 31, 1994, for violating company policy. Mr. Dodson then formed several corporations: Capital Alliance, Ltd. and Capital Funding Group of Tulsa were incorporated in August 1994; Capital Alliance Group of Tulsa was incorporated in May 1995. Mr. Dodson was president of all three companies. Mr. Dodson had previously incorporated Heilbronn Holdings, Inc. in December 1989 and was its president. In May 1996, he reorganized Capital Alliance, Ltd., merged it with Heilbronn Holdings, Inc., and renamed it Capital Alliance, Inc. He had similarly organized a limited liability company, Stone Hedge Investors Fund 1993, LLC in February 1994, of which he was the managing member and chief executive officer, as well as Sontheim Asset Management, Inc., incorporated in February 1995. Mr. Dodson owned Sontheim until May 1996, at which time it became a wholly-owned subsidiary of Capital Alliance, Inc. Mr. Dodson was at all times Sontheim's president.

Between September 1995 and March 1997, Mr. Dodson was registered under the Oklahoma Securities Act as an investment advisor. In April of 1996, the Oklahoma Department of Securities ("ODS") began investigating Mr. Dodson after possible securities violations were discovered following a routine compliance audit. The government established at trial that Mr. Dodson had solicited a number of his former clients at Dean Witter and convinced them to liquidate their investments at Dean Witter and elsewhere and invest their savings with him. He promised to place their funds in secure, risk-free investments, with a guaranteed rate of return. In fact, however, Mr. Dodson embarked on a scheme whereby he invested his clients' funds in the three Capital Alliance companies (Capital Alliance Ltd., Capital Alliance Group of Tulsa, and Capital Funding Group of Tulsa), without disclosing to his clients the true nature of the companies or that he (Mr. Dodson) had formed, owned and controlled them. He then used the diverted money to repay other business loans and personal expenses. As part of this scheme, Mr. Dodson mailed fraudulent account statements to his investors using the United States mails. The shares of Capital Alliance stock issued to Mr. Dodson's investors were deemed worthless because the Capital Alliance companies had no assets. The ODS investigation into Mr. Dodson led to a referral of the matter to the FBI, which led to the multi-count indictment against Mr. Dodson.

The indictment alleged that, between March 1, 1994, and April 30, 1997, Mr. Dodson devised and implemented a scheme to defraud numerous people by convincing them, through material misrepresentations, to invest money with his Capital Alliance group, and that Mr. Dodson utilized the United States mails and other commercial interstate carriers to accomplish the scheme. The money laundering count was based upon an allegation that Mr. Dodson used the proceeds from his mail fraud scheme to purchase a cashiers' check, which he then used for his own personal purposes. The perjury count alleged that Mr. Dodson testified falsely before a Securities and Exchange Commission officer in connection with the SEC's investigation of a company called Reconversion Technology.

Most of the victims of Mr. Dodson's fraudulent scheme were elderly retired individuals, many of whom had been clients of Mr. Dodson's while he worked at Dean Witter. Many of them lost virtually all or a significant portion of their life savings.

Prior to trial, Mr. Dodson filed two motions to sever the perjury charge from the mail fraud and money laundering counts. The district court denied both motions. Following a two and one-half week trial, the jury convicted Mr. Dodson of all twenty-one mail fraud counts and of the one money laundering count, and acquitted him of the perjury charge. At sentencing, the district court departed upward four levels, concluding that this was a case in which "the loss determined

under [USSG § 2F1.1](b)(1) does not fully capture the harmfulness and seriousness of the conduct." USSG § 2F1.1, cmt.11. [1] The court accordingly sentenced Mr. Dodson to 108 months, concurrent with the multiple 60-month sentences, followed by three years of supervised release.

Mr. Dodson appeals his conviction and sentence, arguing: (1) the district court erred in failing to sever the perjury charge from the remaining charges; (2) the jury instructions on the money laundering charge were inadequate; and (3) the district court erroneously departed upward in sentencing Mr. Dodson. Mr. Dodson seeks a remand for a new trial and/or for resentencing. We reject these arguments and affirm his conviction and sentence.

**DISCUSSION**

**I. Joinder of Perjury Charge**

Fed. R. Crim. P. 8(a) permits joinder of offenses "if the offenses charged . . . are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." Where the joinder of offenses results in prejudice to the defendant, "the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever relief justice

---

[1]At the time Mr. Dodson was sentenced, this was note 10.

requires." Fed. R. Crim. P. 14. Mr. Dodson argues that the perjury count should not have been joined with the mail fraud and money laundering counts under Rule 8. Further, he asserts that the district court's refusal to sever the perjury count from the other counts pursuant to Rule 14 resulted in unfair prejudice to him.

The alleged improper joinder of offenses is a question of law which we review de novo, broadly construing Rule 8 to allow liberal joinder in the interests of judicial efficiency. See United States v. Johnson, 130 F.3d 1420, 1427 (10th Cir. 1997). Even if joinder is proper under Rule 8, however, the district court may still sever offenses for separate trial under Rule 14, if the defendant may be prejudiced by the joinder. We review a district court's denial of a motion to sever for abuse of discretion. See id. To establish such an abuse of discretion, a defendant must demonstrate that his right to a fair trial was threatened or actually deprived. See id. A defendant's burden to show abuse of discretion in this circumstance "'is a difficult one.'" Id. (quoting United States v. Valentine, 706 F.2d 282, 290 (10th Cir. 1983)).

As indicated above, the perjury charged stemmed from Mr. Dodson's July 1995 testimony before an SEC officer regarding the SEC's investigation of a company called Reconversion Technology Corporation. Mr. Dodson, under oath, allegedly failed to inform the SEC officer of all the corporate entities (in particular the Capital Alliance group as well as Sontheim Asset Management)

with which Mr. Dodson had an association as an employee, director, officer or consultant. The government argues that Mr. Dodson needed to keep his ownership of those other companies secret from his clients and from the SEC, in order to successfully continue to pursue his mail fraud scheme. Thus, it argues the perjury count and the mail fraud and money laundering counts "were part of two or more acts or transactions connected together and constituting parts of a common scheme or plan" under Rule 8(a). Appellee's Br. at 6. Mr. Dodson responds that the perjury charge was utterly unrelated to the mail fraud and money laundering counts, and introduction of evidence relating to it—i.e., Mr. Dodson's testimony before the SEC officer—constituted the only testimony by Mr. Dodson before the jury, and it suggested that he was a liar, thereby prejudicing him. [2]

Bearing in mind the liberal standard for joinder under Rule 8(a), we agree with the government and the district court that joinder of the perjury charge was proper under Rule 8(a). At the time Mr. Dodson testified before the SEC, he was in the midst of his fraud scheme, which depended for its success upon his withholding from his clients and any investigatory body the fact that he owned the Capital Alliance group companies in which he was purportedly investing his clients' money. Even if he had additional reasons for not disclosing to the SEC

---

[2]Mr. Dodson did not waive his Fifth Amendment right not to testify at his trial. As a result, the SEC testimony was the only testimony by Mr. Dodson which the jury considered.

his ownership of those companies, it necessarily was also important to his fraud scheme that he keep that ownership secret. [3]

Mr. Dodson argues that, regardless of his need to conceal his ownership of the companies as part of his fraud scheme, we must determine the propriety of joinder strictly from the face of the indictment. He asserts that the mail fraud and money laundering counts in the indictment make no mention of the perjury charge, nor does the perjury charge mention the fraud and money laundering counts. That is not dispositive. From the face of the indictment, it is clear that it was significant for the mail fraud and money laundering counts, as well as for the perjury count, that Mr. Dodson was in fact the president and incorporator of the Capital Alliance group of companies and Sontheim Asset Management and that he kept that fact secret. Thus, the information with respect to which Mr. Dodson allegedly perjured himself was information which was also highly relevant to, and "of the same or similar character" as, the mail fraud and money laundering

_____

[3]Mr. Dodson argues that the SEC interviewed him as part of its investigation into Reconversion Technologies "in order to discover which, if any, of the companies Dodson was involved in between January 1, 1994 and July 19, 1995, had purchased Reconversion Technologies stock. The SEC wanted to uncover any payoffs from Reconversion Technologies to Dodson in exchange for the trading services Dodson could supply." Appellant's Reply Br. at 6-7. Because Heilbronn Holdings was the only company of Mr. Dodson's which had actually purchased Reconversion Technologies stock, Mr. Dodson argues that his nondisclosure of his involvement with the other companies was in fact irrelevant to the SEC investigation, and does not demonstrate an intent to defraud.

counts. Fed. R. Crim. P. 8(a). We therefore agree that the perjury count was properly joined with the other counts.

Furthermore, we agree that Mr. Dodson has failed to meet his heavy burden of establishing that his right to a fair trial was threatened or actually deprived by the joinder of the perjury charge with the other charges. We so conclude for several reasons. First, Mr. Dodson was acquitted of the perjury charge. Thus, while the jury heard evidence suggesting that Mr. Dodson had lied, it evidently concluded that he did not commit perjury in his statement to the SEC officer. Moreover, the alleged perjury related to Mr. Dodson's failure to disclose his ownership and presidency of the Capital Alliance group of companies and Sontheim Asset Management. But, as indicated, the concealment of his status vis-a-vis those companies was at the heart of his mail fraud scheme, and the jury heard ample evidence from many sources that he had concealed that status. The added minor evidence that he also concealed that status from the SEC would not have seriously affected the fairness of his trial. [4] We therefore discern no abuse of discretion in the district court's denial of his motions to sever.

---

[4]We likewise conclude that the presentation of that evidence did not violate his Fifth Amendment right not to testify at his trial. This is no different from the myriad of other situations where a defendant chooses not to testify, but the government introduces evidence of other statements he has made.

## II. Jury Instructions on Money Laundering

Mr. Dodson also argues that the jury instructions on the money laundering count were incomplete because the court failed to explicitly list as an essential element of the crime the requirement that the monetary transaction at issue affect interstate commerce. [5] We disagree.

"We examine jury instructions as a whole to evaluate their adequacy, and review the propriety of tendering an individual instruction de novo." United States v. Hanzlicek, 187 F.3d 1228, 1233 (10th Cir. 1999). The instruction given to the jury in this case on the money laundering count stated as follows:

> The crime of engaging in an unlawful monetary transaction in property derived from mail fraud or wire fraud . . . has five essential elements which must be proved beyond a reasonable doubt:
>
> **FIRST:** The defendant knowingly engaged, or attempted to engage, in a "monetary transaction" (as that term will be defined later);

---

[5] 18 U.S.C. § 1957 provides in part as follows:

(a) Whoever . . . knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished . . . .

"Monetary transaction" is defined as "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument . . . ." 18 U.S.C. § 1957(f)(1).

- 10 -

| | |
|---|---|
| **SECOND:** | The monetary transaction was in property of a value greater than $10,000; |
| **THIRD:** | That the property was derived from mail frauds, as those offenses are defined in these instructions; |
| **FOURTH:** | The defendant knew that the property constituted or was derived from proceeds obtained from a criminal offense; and |
| **FIFTH:** | The monetary transaction took place in the United States. |

Appellant's App. at 156-57. The instruction then defined "monetary transaction" as follows:

> The term "monetary transaction", as used in these instructions, includes a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree.

Id. at 158.

"The requirement that a transaction be 'in or affecting interstate commerce' is both jurisdictional and an essential element of the charge of money laundering under 18 U.S.C. § 1957." United States v. Trammell, 133 F.3d 1343, 1353 (10th Cir. 1998). Mr. Dodson argues that the instruction's failure to explicitly list an effect on interstate commerce as an essential element, along with the fact that the definition of "monetary transaction" merely states that it "includes" transactions

involving the use of a financial institution involving interstate commerce, rendered the instruction misleading. [6] We disagree.

While not an ideal money laundering instruction, we conclude that, read as a whole, any reasonable juror would have understood that the monetary transaction must involve the use of a financial institution which is engaged in, or the activities of which affect, interstate commerce. We therefore hold that Mr. Dodson is not entitled to a new trial based upon an alleged instructional error.

### III. Upward Departure at Sentencing

Finally, Mr. Dodson argues the district court improperly departed upward four levels at sentencing. When reviewing an upward departure, we inquire:

> (1) whether the factual circumstances supporting a departure are permissible departure factors; (2) whether the departure factors relied upon by the district court remove the defendant from the applicable Guideline heartland thus warranting a departure; (3) whether the record sufficiently supports the factual basis underlying the departure; and (4) whether the degree of departure is reasonable.

United States v. Whiteskunk, 162 F.3d 1244, 1249 (10th Cir. 1998) (quoting United States v. Collins, 122 F.3d 1297, 1303 (10th Cir. 1997)). Furthermore,

---

[6]The government urges us to review this instruction only for plain error, asserting that Mr. Dodson failed to properly object to the instruction before the district court. Mr. Dodson responds that he did generally object to the failure to include an effect on interstate commerce as an essential element of the crime of money laundering. The standard of review is not dispositive in this case, since under any standard we find no error in the instruction as given.

"[w]e review the district court's decision to depart from the Sentencing Guidelines under a unitary abuse of discretion standard." United States v. Smith, 133 F.3d 737, 747 (10th Cir. 1997).

In this case, in determining to depart upward, the district court noted that Mr. Dodson's offense was "outside the heartland of cases." Appellant's App. at 264. The court observed that the guidelines explicitly contemplate an upward departure where the loss caused by the fraud "does not fully capture the harmfulness and seriousness of the conduct." USSG § 2F1.1, cmt.11. The court then provided two specific grounds for departing upward. These two grounds are explicitly set out in the guidelines as examples of situations where the loss does not fully capture the harmfulness and seriousness of the conduct: "the offense caused reasonably foreseeable, physical or psychological harm or severe emotional trauma" and "the offense involved the knowing endangerment of the solvency of one or more victims." USSG § 2F1.1. cmt.11(c), (f). Mr. Dodson argues this constitutes impermissible "double counting" because "[t]he factors listed are inherently contemplated in the sentencing guidelines allowing for an enhancement based upon the amount of loss caused by Dodson's conduct, pursuant to USSG § 2F1.1(b)(1)(N)." Appellant's Br. at 27.

We disagree that the district court improperly "double counted" in calculating its upward departure, or otherwise abused its discretion. The court

clearly explained why it concluded this case was outside the heartland of typical fraud cases:

> Trial evidence, the Victim Impact Statements presented to the U.S. Probation Office, and testimony of some victims at the sentencing hearing, show Dodson's conduct was particularly egregious. It is clear his victims were psychologically, emotionally, and financially devastated because of his offense conduct. Many victims detailed the psychological harm and severe emotional trauma they have suffered from worrying about the future without the benefit of the lost funds. Dodson had personal knowledge of his victims' financial conditions. Their psychological harm and severe emotional trauma were reasonably foreseeable to him.
>
> Several victims lost all savings to the point their solvency was and is endangered. The Court needs only to find one victim that meets this requirement but in this case several victims reported losing most if not all of their savings. Some either depend heavily or completely on social security for their support. Several victims reported in their testimony or written statement that they have significantly altered their lifestyle because of their lost savings.

Appellant's App. at 264. The district court's findings are amply supported by the record. Moreover, contrary to Mr. Dodson's argument, these circumstances are not inherently included within the enhancement based on the amount of loss. As the presentence report in this case acknowledges, the amount of loss enhancement does not differentiate between "a $300,000 loss to a person who has a net worth of millions of dollars and a person whose total savings consisted of $300,000." PSR at 33. We find no abuse of discretion in the district court's determination that this case was not a typical fraud case, and that an upward departure was warranted.

We further conclude that the degree of departure was reasonable. <u>See</u> <u>Smith</u>, 133 F.3d at 751; 18 U.S.C. § 3742(e)(3). The district court decided upon a four-level upward departure by analogizing the case to USSG § 2F1.1(b)(6), which at the time of sentencing provided a four level increase "if the offense . . . substantially jeopardized the safety and soundness of a financial institution."[7] The court concluded that Mr. Dodson's offenses "substantially jeopardized the solvency of approximately fourteen individuals because of the loss of most, if not all of their life savings." Appellant's App. at 264. Noting that a long prison sentence was warranted "to address the sentencing objectives of punishment, deterrence, and protection of the public," <u>id.</u>, the district court's selection of a four-level departure was reasonable.

For the foregoing reasons, we AFFIRM Mr. Dodson's conviction and sentence.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge

---

[7]This is currently subsection (7).