**UNITED STATES of America, Plaintiff-Appellee,**

v.

**John B. O'MALLEY, Jr., Defendant-Appellant.**

No. 75–1282.

United States Court of Appeals, Tenth Circuit.

Decided April 22, 1976.

Rehearing Denied July 8, 1976.

James L. Treece, U. S. Atty., and Richard P. Slivka, Asst. U. S. Atty., Denver, Colo., for plaintiff-appellee.

Lawrence M. Henry, Denver, Colo., for defendant-appellant, and John B. O'Malley, Jr., defendant-appellant, filed additional pro se brief.

Before LEWIS, Chief Judge, and BREIT-ENSTEIN and McWILLIAMS, Circuit Judges.

McWILLIAMS, Circuit Judge.

John B. O'Malley, Jr., and Thomas K. Hudson were jointly charged in a three-count indictment with violation of the so-called fraud by wire statute. 18 U.S.C. § 1343. Specifically, both were charged with devising a scheme and artifice to defraud Matthey-Bishop, Inc. of Malvern, Pennsylvania by means of false and fraudulent pretenses, representations and promises, well-knowing that such representations were false and that in connection therewith had transmitted sounds by means of certain telephone conversations in interstate commerce. Each count was based on a different interstate telephone conversation. O'Malley's case was severed for trial purposes, and in a jury trial O'Malley was convicted on each of the three counts. On appeal counsel for O'Malley raises what is essentially one proposition, namely, the evidence is legally insufficient to show that O'Malley devised, or had an intent to devise, a scheme to defraud Matthey-Bishop. In other words, it is conceded here, as it was established in the trial court, that O'Malley and Hudson had used the telephone in interstate commerce to further their relations with Matthey-Bishop. It is O'Malley's contention, however, that he had not devised, nor did he ever intend to devise, a scheme to defraud Matthey-Bishop. Rather, according to counsel, the evidence only showed preliminary business negotiations between the two defendants and Matthey-Bishop, which negotiations did not culminate in an agreement between the parties, and which, under the peculiar circumstances of the case, never could have resulted in any agreement. The facts are somewhat on the bizarre side, and a brief summary thereof will put the case in focus.

O'Malley, a licensed civil engineer, had through practical experience acquired some knowledge in the fields of metallurgy and chemistry. O'Malley was the president of Applied Chemicals, Inc., a Colorado corporation, which had a refinery located in Denver, Colorado. Thomas K. Hudson, a Denver lawyer, represented both O'Malley and Applied, and O'Malley maintained a business office in Hudson's suite of law offices.

In June 1974, O'Malley and Hudson contacted various commodity brokers and let it be known that Applied had 300,000 ounces of platinum for sale. Brokerage agreements were made between these brokers and the two defendants. These brokers in turn contacted other brokers in their search for potential buyers of platinum. It was in this manner that a Mr. Cote eventually contacted Matthey-Bishop in Pennsylvania to ascertain if the latter was interested in buying platinum. Matthey-Bishop is a United States subsidiary of an English company which is one of the world's largest refiners of platinum. Matthey-Bishop immediately became suspicious because, in the first place, they were not familiar with Cote, and also because they were totally amazed at the large amount of platinum which was allegedly available for purchase. Because of these suspicions, Matthey-Bishop contacted the F.B.I. at once. It was agreed that Matthey-Bishop would follow through and make contact with O'Malley and Hudson, and that one Joseph Lanahan, the manager of the metal control group of Matthey-Bishop, would go to Denver and make the actual contact. It was further agreed that one Michael Melvin, an F.B.I. agent, would accompany Lanahan and would pose and be introduced as Lanahan's newly hired assistant.

Lanahan and Melvin made two trips to Denver and on each occasion had rather extended conversations with both O'Malley and Hudson. Also, Lanahan and Melvin were escorted around the plant premises of Applied by O'Malley. The latter in his conversations represented that: (1) Applied had a present capacity to produce 300,000 ounces of platinum at a cost to Matthey-Bishop of some $60,000,000; (2) that he, O'Malley, had a secret process for extracting precious metals in the form of platinum, gold and silver from ore and metal bars, known as dore bars, stockpiled on the premises of Applied; and (3) that a metal bar known as a "dore bar," given by O'Malley to Matthey-Bishop to show his "good faith," contained in excess of 85% platinum family elements. There was evidence adduced at trial by the Government to show that these representations, as well as others, were false.

Once O'Malley had exhibited his "good faith," as above referred to, O'Malley and Hudson were continually requesting Matthey-Bishop to show its "good faith" by issuing either a letter of credit or a letter of intent, or some other form of collateral, which they said would be placed in an escrow account which they (O'Malley and Hudson) claimed to have in the First National Bank of Nashville, Tennessee. When Lanahan and Melvin refused to thus show their "good faith," Hudson stated that there could be no loss to Matthey-Bishop if there was non-performance by O'Malley, since the collateral would then be returned from the escrow account to Matthey-Bishop. It later developed that O'Malley and Hudson did not have an escrow account in the Nashville bank, only a straight checking account from which they could withdraw anything deposited therein. During the entire negotiations the defendants were offering to sell 1,500 ounces of platinum per month to Matthey-Bishop with the latter to have first refusal on any production over 1,500 ounces per month. In connection therewith the evidence is such as to permit the inference that O'Malley and Hudson were putting pressure on Matthey-Bishop to immediately enter into a contract or at least indicate good faith by placing a letter of credit, or something akin thereto, in the escrow account in the Nashville bank.

As indicated, Matthey-Bishop never had any intention to enter into an agreement with O'Malley and Hudson. There is the suggestion that such fact, coupled with the further fact that it was Matthey-Bishop

which first approached the defendants with a view toward buying platinum, defeats any charge that it was the defendants who devised a scheme to defraud Matthey-Bishop. We do not agree with this suggestion. In the first place it was O'Malley and Hudson who first let it be known that they had platinum for sale. They contacted local brokers, who in turn contacted other brokers, and it was one of this latter group who initiated the first contact with Matthey-Bishop. So, in truth, Matthey-Bishop was contacted by the defendants, rather than vice versa. And the mere fact that Matthey-Bishop was suspicious from the start does not mean that the defendants did not themselves have a scheme to defraud some unwary purchaser, whoever he might be. In this general connection it is well established that in a prosecution under 18 U.S.C. § 1343, i. e., use of interstate communications to further a preconceived scheme to defraud, the prosecution need not prove that the scheme was successful or that the intended victim suffered a loss or that the defendant secured a gain. The gist of the offense is a scheme to defraud and the use of interstate communications to further that scheme. *See Brandon v. United States,* 382 F.2d 607 (10th Cir. 1967); *see also United States v. Jackson,* 451 F.2d 281 (5th Cir. 1971), *cert. denied,* 405 U.S. 928, 92 S.Ct. 978, 30 L.Ed.2d 801; *United States v. Gross,* 416 F.2d 1205 (8th Cir. 1969), *cert. denied,* 397 U.S. 1013, 90 S.Ct. 1245, 25 L.Ed.2d 427 (1970); and *Huff v. United States,* 301 F.2d 760 (5th Cir. 1962), *cert. denied,* 371 U.S. 922, 83 S.Ct. 289, 9 L.Ed.2d 230.

As mentioned at the outset, counsel's basic theme as set forth in his brief is that O'Malley, though not technically a victim of entrapment, was nonetheless "set up" by Matthey-Bishop, to the end that he, O'Malley, did not, nor did he ever intend to have, any scheme to defraud. We disagree with this line of reasoning.

■ Our study of the record convinces us that the issue as to whether O'Malley had devised a scheme to defraud, and whether he had any actual intent to defraud, posed questions of fact that were properly submitted to the jury. By its verdict the jury has determined that O'Malley did have such a scheme and intent. And the record in our view is supportive of the jury's resolution of the matter. As indicated above, the issue is in reality O'Malley's state of mind, and the fact that Matthey-Bishop was not about to be taken in does not defeat the charge. Throughout counsel's brief runs the recurring question as to just what O'Malley could possibly have expected to gain from any representations he may have made to Matthey-Bishop. In our view the state of the record is such as to permit the inference that O'Malley and Hudson sought to pressure Matthey-Bishop into signing a contract to purchase platinum and making an immediate payment thereon, even though the defendants knew they would be unable to ever perform. And there is abundant evidence that when it became evident that Matthey-Bishop would not sign a contract, O'Malley and Hudson sought to have Matthey-Bishop at least show its good faith by placing something of value in O'Malley's account in the bank in Nashville, Tennessee, which was a straight checking account, and not an escrow account as represented by both defendants. The foregoing are but two illustrations of possible gain envisioned by the defendants in their negotiations.

A recent opinion of the Colorado Court of Appeals involving this same defendant, O'Malley, is illustrative of the latter's *modus operandi. See People v. O'Malley,* Colorado Court of Appeals, No. 75–240, filed April 8, 1976. There O'Malley was trying to sell silver. There, as here, O'Malley escorted his prospective customer around the premises of Applied and made false representations as to the current capacity of the plant to produce silver. Indeed, a reading of that opinion indicates that O'Malley's misrepresentations were quite similar to those made in the instant case. There, however, the intended victim was not as wary as Matthey-Bishop and the victim in that case paid O'Malley some $60,000 on the latter's promise to sell him silver. In the Colorado case a jury found O'Malley guilty of theft by deception, § 18–4–401, C.R.S.

1973, and in effect found that O'Malley never intended to deliver the silver which he had contracted to deliver. On appeal the Colorado Court of Appeals, speaking through Judge Coyte, affirmed, and held that the State had established a *prima facie* case of theft by deception. The fact that here Matthey-Bishop refused to be rushed into a contract, unlike the victim in the Colorado case, no doubt explains the recurring efforts of O'Malley and Hudson to pressure Matthey-Bishop into making some sort of a good faith gesture by placing something, presumably of some value, into the defendant's non-existent escrow account in the Nashville, Tennessee bank. All in all, then, in our view, the record supports the jury's verdict.

O'Malley was permitted to file a *pro se* brief which was intended to supplement the brief of his retained counsel. In his *pro se* brief O'Malley urges some fourteen additional grounds for reversal. It is sufficient to state that we have examined each of these contentions and found none to be grounds for reversal.

Judgment affirmed.