**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 7 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS
## TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

DARYOUSH RAHSEPARIAN, also
known as Steve Rahseparian, and
ARDASHIR RAHSEPARIAN, also
known as Ardie Rahseparian,

    Defendants-Appellants.

Nos. 99-6050
99-6052

---

Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 98-CR-70-A)

---

Lawrence S. Robbins (Lily Fu Swenson, with him on the briefs), of Mayer,
Brown, & Platt, Washington, D.C., for Defendants-Appellants.

Barbara E. Poarch, Assistant United States Attorney (Patrick M. Ryan, United
States Attorney, with her on the briefs), Oklahoma City, Oklahoma, for
Plaintiff-Appellee.

---

Before **SEYMOUR**, Chief Judge, **TACHA** and **BRISCOE**, Circuit Judges.

---

**SEYMOUR**, Chief Judge.

After a joint jury trial, co-defendants Ardashir (aka Ardie) and Daryoush (aka Steve), along with Jalal (aka Jack) Rahseparian, were convicted of conspiracy to commit mail fraud, mail fraud, and money laundering. All three appealed. Jack's appeal is addressed in the companion opinion, *see United States v. Rahseparian*, No. 99-6031 (Nov. 7, 2000). Ardie contends on appeal that the evidence is insufficient to sustain his conviction. Ardie and Steve contend a new trial is necessary due to the prosecutor's comment on their failure to testify in violation of *Griffin v. California*, 380 U.S. 609 (1965). Steve further claims a new trial is required because of certain incriminating hearsay statements elicited by the prosecutor in violation of *Bruton v. United States*, 391 U.S. 123 (1968). We affirm.

# I

## BACKGROUND

Ardie and Steve Rahseparian are the sons of Jack Rahseparian. At the time of the conduct for which they were charged, Steve resided in Altoona, Pennsylvania, Ardie resided in Fort Smith, Arkansas, and Jack resided and worked in Shawnee, Oklahoma. The government contended at trial that Ardie and Steve Rahseparian formed Genesis Marketing, a telemarketing company, through which they and their father conspired to commit and did commit mail fraud from May 1994 to May 1995. The government further successfully argued that Ardie,

Steve, and Jack Rahseparian laundered the proceeds from the telemarketing scheme through Jack's business checking accounts.

Brad Russell, the company's only employee other than the Rahseparians themselves, testified on behalf of the government. Mr. Russell was a personal friend of Ardie. The two worked out of Ardie's apartment in Fort Smith as the sole telemarketers for Genesis Marketing. Mr. Russell testified that he and Ardie would entice customers over the telephone to buy products, such as water purifiers and "Say No to Drugs" kits, at highly inflated prices in exchange for a guaranteed valuable prize. Those customers never received their promised prizes, however, and many did not even receive their purchased product. It is on this basis that the government argued the Rahseparians conspired to commit and did commit mail fraud, and that they laundered the proceeds.

Submitting no evidence, the Rahseparians' defense relied on the theory that Ardie and Steve never intended to commit fraud but rather intended only to run a legitimate telemarketing business. Thus, the sole issue at trial was the defendants' intent. To prove this element, the government offered evidence of the unusual business practices of the Rahseparians, mainly through the testimony of Mr. Russell regarding the "pitch" he and Ardie used when contacting potential customers. Mr Russell testified that they would begin a solicitation by giving a false name and informing the potential customer that he or she was selected to

receive one of five prizes, then listing four valuable prizes and one prize which was always much cheaper in value than the others.[1] Mr. Russell and Ardie would then solicit the customers to purchase certain products at highly inflated prices in exchange for the prize. Mr. Russell further testified that he and Ardie directed customers to send their checks for the purchase price via Federal Express to a mail box located in Shawnee, Oklahoma.

The government established that these checks were deposited into three separate bank accounts: a business checking account at American National Bank in Shawnee, Oklahoma, established in the name of Jack Rahseparian's business; a business checking account at MidFirst Bank in Shawnee, Oklahoma, also established in the name of Jack's business; and a joint checking account at the MidFirst Bank established in the names of Jack and Steve Rahseparian. Moreover, Mr. Russell testified that Jack called Ardie every day or every other day to find out "how many checks to expect and how much they were." App., vol. II at 546. Mr. Russell also testified that Jack picked up those checks from the mailbox and deposited them into his accounts.

---

[1] The possible prizes promised to the customers included items such as a trip to Disneyland, a pound of gold, an ancient Spanish coin plaque, an appliance package, or a $3,500 award. The ancient Spanish coin plaque was considerably less valuable and was intended to be the award the customer received.

Mr. Russell's testimony also established that each day after he and Ardie made the solicitations, they would forward information to Steve Rahseparian regarding the customers' names, the product purchased and the amount paid, and which cheaper prize had been mentioned to the customer. Steve was supposed to fill the orders and ship the cheap prize from Pennsylvania to the customers. Mr. Russell testified that, after a period, he and Ardie began receiving complaints from customers that they had not received their products or their prizes. He also testified that these complaints were reported to Steve. Although some customers ultimately received their purchased products, none received their promised prizes.

The government also offered evidence regarding other unusual business practices followed by the Rahseparians when conducting business through Genesis Marketing, including the use of aliases. The mail box located in Shawnee where the customers were directed to send their checks was provided by a commercial vendor called "The Copy Stop."[2] The mail box was set up in the name "Steven Woods/Genesis Marketing." The Copy Stop's records indicated the local contact for the box was a person named "Jack," with a local telephone number of Jack Rahseparian's business. In addition, Genesis Marketing had a toll-free business number which serviced Ardie's residence in Ft. Smith. The

---

[2]The record is not clear whether the business name was "The Copy Shop," or "the Copy Stop," and the parties refer to this business under both names.

government presented evidence that this number was originally established under the name "Lloyd Woods" and was later changed to "Steve Rah." Although the actual phone number was assigned to Fort Smith, the bill was sent to and paid for by Steve in Pennsylvania.

After hearing all of this evidence and reviewing the supporting documentary evidence, the jury returned a guilty verdict against all three defendants on the sixteen counts of conspiracy to commit mail fraud, mail fraud, and money laundering. Steve and Ardie moved for a judgment of acquittal, arguing there was insufficient evidence that they conspired to or intended to commit mail fraud, or that they intended to commit money laundering. The district court denied the motions, finding with respect to Steve and Ardie the evidence reflected that Ardie made misrepresentations to potential customers in an effort to receive highly inflated prices for products and continued the solicitations even after Ardie knew Steve was not sending the promised prizes, which was sufficient to uphold both of their convictions on all counts.

## II

### INSUFFICIENCY OF EVIDENCE

On appeal, Ardie contends the government failed to present sufficient evidence of their intent to commit these crimes. All parties agree that conspiracy,

mail fraud, and money laundering are specific intent crimes. *See United States v. Boyd*, 149 F.3d 1062, 1067 (10th Cir. 1998) (money laundering requires specific intent to launder proceeds from a known unlawful activity); *United States v. Smith*, 133 F.3d 737, 742 (10th Cir. 1997) (mail fraud requires specific intent to defraud); *United States v. Blair*, 54 F.3d 639, 642 (10th Cir. 1995) (conspiracy requires specific intent to further the unlawful activity which is the object of the conspiracy). The government was thus required to prove Ardie specifically intended to defraud Genesis' customers, that he made an agreement to that end, and that he laundered the proceeds knowing they were obtained through an illegal activity.

To determine whether evidence is sufficient to uphold a conviction, "we examine, in a light most favorable to the government, all of the evidence together with the reasonable inferences to be drawn therefrom and ask whether any rational juror could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Aruntunoff*, 1 F.3d 1112, 1116 (10th Cir. 1993). Moreover, we "accept the jury's resolution of conflicting evidence . . . . As long as the possible inferences are reasonable, it was for the jury, not the court, to determine what may have occurred." *United States v. Grissom,* 44 F.3d 1507, 1510 (10th Cir. 1995). We will not uphold a conviction, however, that was obtained by nothing more than "piling inference upon inference," *United States v.*

*Fox*, 902 F.2d 1508, 1513 (10th Cir. 1990), or where the evidence raises no more "than a mere suspicion of guilt," *Smith*, 133 F.3d at 742.

We are not persuaded by Ardie's argument that the evidence was insufficient to show his knowing and intentional involvement in mail fraud. To establish his guilt, the government had to prove: (1) Ardie engaged in a scheme or artifice to defraud customers or to obtain money by means of false and fraudulent pretenses, representations or promises; (2) Ardie had the intent to defraud customers, and (3) Ardie used the United States mails or a commercial interstate carrier to facilitate that scheme. *See* 18 U.S.C. § 1341 (1994); *Smith*, 133 F.3d at 742.

With respect to the mail fraud, the jury heard direct testimony from Lorenzo Pitts that Ardie contacted him promising a $300,000 reward for his community involvement with children in exchange for a $2,989 registration fee. Although Mr. Pitts sent the money to Genesis Marketing in Shawnee and it was deposited into Jack's business accounts, Mr. Pitts never received the promised $300,000. The jury also heard evidence from other customers as well as from Mr. Russell that Ardie contacted potential customers and enticed them to purchase products at highly inflated prices in exchange for a promise of prizes which he knew were not being sent. This evidence was sufficient for a jury to make the

reasonable inference that Ardie intentionally defrauded Mr. Pitts, as well as the other customers.  *See Smith*, 133 F.3d at 743.

Under 18 U.S.C. § 371, a conviction for conspiracy requires the government to prove: (1) the defendant's agreement with another person to violate the law; (2) his knowledge of the essential objective of the conspiracy; (3) his knowing and voluntary involvement; and (4) interdependence among the alleged coconspirators.  *See United States v. Edwards*, 69 F.3d 419, 430 (10th Cir. 1995).  Stated simply, Ardie's conviction for conspiracy required the government to prove Ardie had an explicit or implicit agreement with Steve or Jack to commit mail fraud.  In this regard, the government presented abundant evidence of the collaboration between Ardie and Steve on how Genesis Marketing was to be run.  The inference that they explicitly or implicitly agreed to defraud customers was a reasonable one for the jury to make.

Ardie cites us to *United States v. Migliaccio*, 34 F.3d 1517 (10th Cir. 1994), for the proposition that where the evidence only shows the defendants were involved in a lawful business activity together, it is insufficient for the jury to infer a criminal agreement.  In contrast to the facts in *Migliaccio*, however, the jury here was presented with evidence permitting the reasonable inference that Ardie knew Genesis Marketing was not a lawful business.  Genesis Marketing's support services were set up under various aliases, its income was sent to a distant

location unconnected in any way with its business operations, its profits were deposited into checking accounts also unrelated to the business, and customers were constantly notifying Ardie that they were not receiving their products or their prizes. *See, e.g., United States v. Gray*, 105 F.3d 956, 965 (5th Cir. 1997) (sufficient evidence to uphold conviction for mail fraud and conspiracy where organizer of fraudulent telemarketing scheme concealed his role through the use of false identities, aliases, and intermediaries). In short, there was ample evidence from which a reasonable jury could infer that Ardie knew the business in which he was involved was unlawful, and that Ardie and Steve made a criminal agreement to commit mail fraud through Genesis Marketing. The holding of *Migliaccio* simply does not apply in these circumstances.

The jury also heard sufficient evidence to allow it to convict Ardie of money laundering. To establish his guilt for money laundering under 18 U.S.C. § 1956, the government was required to prove: (1) Ardie knowingly conducted a financial transaction; (2) he knew the funds represented proceeds of an unlawful activity; (3) the funds actually did represent the proceeds of the unlawful activity; and (4) the transaction was designed to conceal the nature, location, source ownership or control of the proceeds. 18 U.S.C. § 1956(a)(1)(B)(i) (1994). The evidence presented showed that Ardie had the income from the mail fraud sent to a mail box in Shawnee where his father would pick it up and deposit it into

different checking accounts, none of which were connected with Genesis Marketing. The jury could make the reasonable inference from this evidence that these transactions were designed to "conceal the nature, location, source ownership or control of the proceeds" of the income from Genesis Marketing.

Consequently, the district court properly denied Steve and Ardie Rahseparian's motions for judgment of acquittal.

## III

### *GRIFFIN* CHALLENGE

In *Griffin v. California*, 380 U.S. 609 (1965), the Supreme Court held that the Fifth Amendment privilege against self-incrimination prohibits a prosecutor from commenting on a defendant's invocation of his right not to testify. *See id.* at 615. The *Griffin* rule is violated when a prosecutor uses language which is "manifestly intended" to be a comment on the defendant's failure to testify or "of such character that the jury would naturally and necessarily" take it to be such a comment. *United States v. Barton*, 731 F.2d 669, 674 (10th Cir. 1984) (quoting *Knowles v. United States*, 224 F.2d 168, 170 (10th Cir. 1955)).

During closing arguments in this case, the prosecutor told the jurors they would have to use their common sense to infer a criminal agreement between the Rahseparians "[b]ecause here we don't have an inside person, we don't have one

-11-

of the three members here at the counsel table." App., vol. III at 743. The Rahseparians contend this was a comment by the prosecutor on the exercise of their Fifth Amendment rights in violation of *Griffin*. The government argues the prosecutor was merely asking the jurors to infer a criminal agreement based on the evidence presented. At most, the comment was aimed only at the conspiracy charge.

The prosecutor's closing argument spanned twenty pages of transcript, most of which went to the conspiracy charge. Regarding the agreement element of conspiracy, the prosecutor told the jurors they could find such an agreement absent express proof as long as they believed there was an understanding between the Rahseparians to commit mail fraud. She outlined the evidence presented regarding the mailbox, the Federal Express account, the 1-800 telephone number, and the products that were ordered. On the eighth transcribed page of her argument, she returned to the issue of the required criminal agreement and reiterated that the government was not required to prove a formal agreement. It was in this context that the prosecutor made the comment in question:

> The Court instructed you not to leave your common sense at home, and I would ask you to do the same thing, particularly when we talk about the area here of an agreement and what these defendants agreed upon. *Because here we don't have an inside person, we don't have one of the three members here at the counsel table.* Here is what I would like you to do is use your common sense, and as I go through these items, to think, is it reasonable that these defendants

wouldn't have talked to each other, that they wouldn't have come to some type of agreement or understanding.

*Id.* at 743 (challenged comment emphasized). The prosecutor then discussed in detail all of the evidence referred to above, and completed her argument as to the conspiracy charges by asserting, "[t]here had to have been discussions, and the evidence, you may infer, is that these defendants did indeed have an agreement. And this agreement was to engage in criminal activity." *Id.* at 748. Her argument went on to cover the charges of mail fraud and money laundering before concluding seven transcribed pages later.

In response to the Rahseparians' objections, the district court held the challenged statement was not a comment on the defendants' failure to testify, but rather a concession of a flaw in the government's case caused by the lack of direct testimony evidencing a criminal agreement. The district court pointed to the full context of the prosecutor's argument in support of this interpretation. *See* App., vol. I, at 198. The district court denied counsel's request for a curative instruction. In its subsequent written order overruling the objection, the court stated that even assuming this comment was intended or was taken by the jury as a comment on the defendants' failure to testify, its normal instructions to the jury on the defendant's right to remain silent made the isolated comment harmless. *See id.*

We have consistently held that a prosecutor may comment on the lack of evidence in a case, *see, e.g.*, *United States v. Gomez-Olivas*, 897 F.2d 500, 503 (10th Cir. 1990) (prosecutor is allowed considerable latitude in commenting on evidence and arguing inferences therefrom), as long as she does not comment on

-13-

the failure of the defendant to provide such evidence, *see Knowles v. United States*, 224 F.2d 168, 170 (10th Cir. 1955) ("[I]t is perfectly proper to comment on the lack of evidence if [the prosecutor] didn't comment on the failure of the defendant to give it."). The circuit courts that have been presented with comments such as the one challenged here have split on whether they are improper comments under the *Griffin* rule or permissible statements regarding the lack of direct evidence.

For example, in *Jacobs v. United States*, 395 F.2d 469 (8th Cir. 1968), four co-defendants were tried for conspiracy to violate bankruptcy laws and commit mail fraud. They offered no testimony in their defense. During rebuttal arguments, the prosecutor asserted, "Where is [the missing merchandise]. . . . [T]here are only four people in this room that know – just four – and they are not about to tell us." *Id.* at 477. The Eighth Circuit held that this comment was a proper rebuttal comment to the defense's attack on the lack of direct testimony on the issue and not a *Griffin* violation. *See id.* In *United States v. Griggs*, 735 F.2d 1318 (11th Cir. 1984), on the other hand, the prosecutor argued to the jury in closing, "[defense counsel] asked you to assume that [element of the defense] even though the defendant has not testified about it." *Id.* at 1320. The Eleventh Circuit found the comment "an unmistakable reference to Griggs' exercise of his fifth amendment privilege. The jury could not have failed to comprehend the remark in any other way." *Id.* at 1324.

In *Berryman v. Colbert*, 538 F.2d 1247 (6th Cir. 1976), the prosecutor made similar comments that were held impermissible under the *Griffin* rule. The defendants there were convicted in state court of robbery, conspiracy to commit

robbery, and murder. In closing arguments, the prosecutor stated, "we are relying almost entirely upon circumstantial evidence. Nobody was there when the robbery took place. Nobody that we can bring here to testify. The defendants here, yes, but we can't get them to testify." *Id.* at 1249. The Sixth Circuit found the comment "to be in square violation of *Griffin v. California*." *Id.* at 1250.

This court has found more benign "innuendos" than these to be violations of *Griffin*. In *Barton*, we held the prosecutor impermissibly commented on the defendants' failure to testify by merely pointing to certain facts which were not explained, when those facts could only be explained by the defendants. *See Barton*, 731 F.2d at 674; *see also Knowles*, 224 F.2d at 170 (assuming without deciding that such a comment was improper). The prosecutor here not only pointed to the lack of direct evidence of the agreement, a fact only the Rahseparians would have evidence of, but further specifically stated the government did not have testimony from the defendants as to that fact.

"The prosecution is entitled to refer to the fact that the defense has failed to rebut a natural inference that may be drawn from the facts in evidence." *Griggs*, 735 F.2d at 1323. In this case, the prosecutor certainly could have permissibly argued to the jury that it should infer there was an agreement. "Arguing inferences is standard business among lawyers, which *Griffin* does not forbid." *Gomez-Olivas*, 897 F.2d at 503. The prosecutor here went one step further, however. Rather than merely argue the inferences which could reasonably be drawn from the evidence, she asserted that the inference should be made precisely because the defendants did not testify. This comment teeters on the fine line

between an impermissible comment on the defendants' failure to testify and a permissible comment on the lack of evidence in a case.

We are likewise in equipose as to how the jury must have necessarily taken this statement. The Rahseparians argue this remark suggested to the jurors that inculpatory evidence was kept from them due to the Rahseparians failure to testify. We do not agree that such a negative inference is a necessary result of this comment. The prosecutor argued to the jury that an inference must be made because there was no direct testimony, which is not unconstitutional. She contended the only reasonable inference to be made in light of all the evidence was that there was a criminal agreement. Her challenged comment standing alone, however, allowed the jury to make any inference, including that there was no criminal agreement.

Determining whether this comment violated the Constitution is problematic in light of the fact that the prosecutor's comment was situated within lengthy but focused arguments regarding the inferences to be made from the evidence presented, and the meaning of the comment is unclear. Given its context and in light of the evidence against Steve and Ardie, we are convinced that even if there was error, it was harmless beyond a reasonable doubt.

The Supreme Court has directed that where the prosecutor makes an impermissible statement under *Griffin*, the government must "prove beyond a reasonable doubt that the error . . . did not contribute to the verdict obtained" to maintain the conviction against the accused. *Chapman v. California*, 386 U.S.18, 24 (1967). When conducting a harmless error analysis, we review the entire record. *See United States v. Hasting*, 461 U.S. 499, 509 n.7 & 510.

The Rahseparians argue that the prosecutor's comments here went to the pivotal inferences the jury must have made to convict them. As such, the comments necessarily were the basis on which the jurors found them guilty. They additionally argue that in light of the circumstantial nature of the case against them, the comments cannot be found harmless beyond a reasonable doubt. The government argues that because the jury was adequately instructed on the weight to be given closing arguments, the government's burden of proof, and the defendant's right to remain silent, the single, isolated comment challenged by the Rahseparians could not have infected the jury's deliberations.

Because the comment here was pointed to the conspiracy charges, our harmless error analysis is complicated by the fact that the evidence as to the criminal conspiracy was entirely circumstantial. In *Chapman*, the Supreme Court held it could not find the prosecutor's impermissible statements harmless beyond a reasonable doubt where all of the evidence in the case was circumstantial. The prosecutor there, however, was working under the California constitutional provision struck down in *Griffin* which allowed such commentary. *Chapman*, 386 U.S. at 19. Thus, the Court was dealing with a case where both the prosecutor's comments and the trial court's jury instructions "continuously and repeatedly" impressed upon the jury that they should draw inferences in favor of the state due to the defendants' silence. *See id.* at 25. The state's case coupled this continuous reliance on the defendants' silence as evidence of guilt with "a reasonably strong 'circumstantial web of evidence.'" *Id.* The Court concluded that looking solely to the circumstantial evidence presented, "honest, fair-minded jurors might very well have brought in not-guilty verdicts." *Id.* at 25-26. The Court held that under

-17-

these circumstances it was completely impossible to find beyond a reasonable doubt the error did not contribute to the defendants convictions. *See id.* at 26.

In *Berryman* , 538 F.2d 1247, the defendant had been convicted of murder and conspiracy to commit robbery. The conspiracy conviction there was supported by a substantial amount of direct evidence, whereas the murder conviction was based entirely on circumstantial evidence. After finding the prosecutor's statements at trial impermissible under *Griffin* , the Sixth Circuit held the error harmless beyond a reasonable doubt as to the conspiracy conviction since the proof there was "direct, positive and undisputed." *Id.* at 1250. The court held to the contrary on the murder conviction stating:

> although we recognize that an appropriate cautionary instruction on the right of the defendant to remain silent was given, we do not feel that it could have cured the effect of the prejudicial and improper comment above as to the murder charge. The proofs of appellant's participation in the murder itself arise solely from circumstance and inference. In such a case properly termed "weak" by the District Judge we cannot consider the prosecutorial misconduct to be harmless beyond reasonable doubt.

*Id.*

This court has also stated that the entirely circumstantial nature of the government's case normally weighs against a finding of harmless error. *See Velarde v. Shulsen* , 757 F.2d 1093, 1095 (10th Cir. 1985). In *Velarde* , we held the prosecution's impermissible comments on the defendant's post-arrest silence (so-called "Doyle" errors) not harmless because the trial lasted only one morning,

-18-

the prosecution's case was entirely circumstantial, and the trial court did not give a curative instruction. *See id.* at 1095-96.

Although the convictions in the present case were based on circumstantial evidence, the trial was not short. The Rahseparian's joint trial consisted of three full days of testimony, and one full day of closing arguments and instructions, with the jury returning a guilty verdict on all counts the fifth day. Despite the circumstantial nature of the government's case, we are convinced that the trial and particularly the lengthy closing arguments during which the prosecutor directed most of her comments towards the reasonable inferences that should be drawn from the evidence made any *Griffin* error harmless.

In this case the district court instructed the jury on the weight to be given closing arguments, the government's burden of proof, and the defendants' right to remain silent. *See* Jury Instructions, app., vol. I, at 51, 53, 58.[3] In *United States*

---

[3]Instruction No. 6 stated:
The burden of proving a defendant guilty beyond a reasonable doubt that rests upon the government and never shifts throughout the trial. The law does not require a defendant to prove innocence or to produce any evidence. He may rely on evidence brought out on cross-examination of witnesses for the government, or the presumption of innocense, or the weakness of the government's case, or favorable inferences casting doubt on guilt, or any of these.
Instruction No. 8 stated:

. . . You are to consider only the evidence in the case; but, in your evaluation of the evidence, you are not limited to the bald statements of witnesses. In considering the evidence and in determining the issues in this case, you should bring to your aid the general knowledge that you possess, your

(continued...)

*v. Hernandez-Muniz*, 170 F.3d 1007, 1011-12 (10th Cir. 1999), we held that a single, vague reference to the defendant's failure to testify was not plain error where the trial court instructed the jury on the defendant's Fifth Amendment rights. *See also Jacobs*, 395 F.2d at 477-78 (jury instructions held to remove any possible prejudice stemming from *Griffin* error). Similarly, the jury instructions here help to convince us that, given the evidence in this case, the allegedly erroneous comment was harmless beyond a reasonable doubt.

---

[3](...continued)
understanding of the ways of the world, and your common sense.

Instruction No. 13 stated:

The Constitution of the United States grants to a defendant the right to remain silent. No inference of guilt may be drawn by any juror from the fact that a defendant does not take the witness stand and testify. It is the government's obligation to prove guilt and a defendant has no obligation to speak. Further, during deliberation, no juror may make any reference to a defendant's decision not to testify.

# IV

## *BRUTON* CHALLENGE

In *Bruton v. United States*, 391 U.S. 123 (1968), the Supreme Court held that in a joint trial, one defendant's "powerfully incriminating extrajudicial statements" regarding a co-defendant violate the co-defendant's Sixth Amendment rights, despite instructions to the jury to disregard that evidence when determining guilt. *Id.* at 1628. Steve Rahseparian contends such an error occurred here. We review this legal issue *de novo*. *See United States v. Verduzco-Martinez*, 186 F.3d 1208, 1212 (10th Cir. 1999).

During the government's case in chief, IRS Agent Sharon Morisette testified that Ardie indicated he was initially reluctant to enter into business with Steve because "[Ardie] said that he didn't trust his brother." App., vol. III at 658. The district court immediately asked the jury to leave the courtroom, and during sidebar held the statement was in violation of the *Bruton* rule. Defense counsel moved for a mistrial, or in the alternative that the court instruct the jury to disregard the statement. The court denied the request for a mistrial but struck the statement from the record, instructed the jury to disregard the statement, and then polled each juror individually to ascertain if he or she could follow the curative instruction. Steve Rahseparian argues that Officer Morisette's statement was covered by the protection of *Bruton* because it was critical to the prosecution's

case, inculpatory towards him, and allowed the jury to infer he is the type of person who would have the intent to commit fraud and launder money, the key issues in this case.

We are not convinced the statement here is one to which the narrow *Bruton* rule applies. In *Bruton*, the Supreme Court held that the co-defendant's confession, which directly implicated Mr. Bruton and was hearsay as to him, was so powerfully incriminating that the Court could not disregard the substantial risk the jury would consider the testimony despite instructions not to do so. *See Bruton*, 391 U.S. at 126-28, 135. However, the Court cautioned against a broad application of its holding, stating that in many cases the jury can and will follow the trial judge's instructions to disregard the information. *See id.* at 135; *Richardson v. Marsh*, 481 U.S. 200, 207 (1987) (*Bruton*'s holding is a narrow exception to the general principle that jurors will follow their instructions). *Bruton* applies only in those few contexts where the statement is so inculpatory as to the defendant that the "practical and human limitations of the jury system cannot be ignored." *Bruton*, 391 U.S. at 135.

The Supreme Court has rejected extending the *Bruton* rule to statements that are not directly inculpatory but only inferentially incriminating. *See Richardson*, 481 U.S. at 208. In *Richardson*, Ms. Richardson and Mr. Williams were co-defendants in a joint trial. Mr. Williams confessed to robbery and

murder and admitted to discussing the crimes while driving in a car prior to committing them. That confession did not refer in any way to Ms. Richardson and was admitted into evidence. Later in the trial, testimony revealed Ms. Richardson was in the car while the conversation took place. In holding that *Bruton* did not apply to Mr. Williams' confession, the Court stated:

> Where the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence. Specific testimony that "the defendant helped me commit the crime" is more vivid than inferential incrimination, and hence more difficult to thrust out of mind. . . . [W]ith regard to inferential incrimination the judge's instruction may well be successful in dissuading the jury from entering onto the path of inference in the first place, so that there is no incrimination to forget.

*Id.* at 208. *See also Gray v. Maryland*, 523 U.S. 185, 195 (1998) ("*Richardson* placed outside the scope of *Bruton*'s rule those statements that incriminate inferentially."); *United States v. Chatman*, 994 F.2d 1510, 1513 (10th Cir. 1993) (inferential incrimination argument unavailing to show *Bruton* violation); *United States v. Markopoulos*, 848 F.2d 1036, 1039 (10th Cir. 1988) (same). The statement at issue here, that Ardie did not trust his brother Steve, is at most inferentially incriminating.

This conclusion is supported by *Gray*, where the Court determined whether a statement made by a co-defendant was accusatory as opposed to inferentially incriminating by assessing how direct and "vivid" the statement was and how

-23-

quickly the jury could make a negative inference from it. *See Gray*, 523 U.S. 196. Only where the inculpatory inference can be made immediately in the mind of a reasonable juror is the statement protected by *Bruton* and any curative instruction insufficient. *See id.* Certainly the immediate inference from Ardie's sibling mistrust is not his brother's intent to commit criminal acts.

Steve Rahseparian contends his brother's mistrust was "critical" to the government's case, relying on *United States v. Glass*, 128 F.3d 1398 (10th Cir. 1997). In *Glass*, we held *Bruton* applied to a co-defendant's statement to police that was not facially or directly inculpatory but revealed the familial relationship between the defendants, a fact critical to the prosecution's case. Contrary to the situation in *Glass*, Ardie's initial feelings towards his brother were not "obviously important" to the government's case. *See id.* at 1405.

For these reasons, we are persuaded the district court's curative action, which struck the statement from the record and instructed the jurors to disregard it, cured any possible prejudice it may have caused Steve.[4]

---

[4] Steve also argues that even if the *Bruton* and *Griffin* errors were harmless by themselves, cumulatively they were prejudicial. Because we conclude no *Bruton* error was committed, a cumulative error analysis is inappropriate. *See United States v. Rivera*, 900 F.2d 1462, 1470-71 (10th Cir. 1990).

-24-

## V

## CONCLUSION

For the reasons stated above, we **AFFIRM** Steve and Ardie Rahseparian's convictions on all counts.