**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 29, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

No. 05-6001

ALAN LOUIS CHAVIS, a/k/a Louis
Allen, a/k/a John Lawrence,

Defendant - Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. CR-04-09-01-M)**

Bill Zuhdi, Oklahoma City, Oklahoma, for Defendant - Appellant.

James F. Robinson, Assistant United States Attorney, (John C. Richter, United
States Attorney, on the brief), Oklahoma City, Oklahoma, for Plaintiff - Appellee.

Before **TACHA**, **HOLLOWAY**, and **HARTZ**, Circuit Judges.

**HARTZ**, Circuit Judge.

Alan Louis Chavis appeals his convictions in the United States District

Court for the Western District of Oklahoma on 11 counts of mail fraud, *see* 18

U.S.C. § 1341, and one count of conspiracy to commit mail fraud, *see id*. § 371.

He contends that (1) the district court denied him his right to counsel, (2) there was insufficient evidence to sustain his convictions, (3) the district court erroneously refused to give a good-faith instruction to the jury, and (4) the district court erroneously sentenced him under the mandatory Sentencing Guidelines scheme. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

## I.   BACKGROUND

Mr. Chavis, using the aliases Louis Allen and John Lawrence, conducted an envelope-stuffing scheme that operated like chain mail. Under the scheme, newspaper advertisements promised employment at home and directed those interested to call a phone number. Those who called ("responders") listened to a recording that asked them to leave their names, addresses, and phone numbers.

Responders who provided their addresses were sent an "introductory" packet, which included a letter from a purported (but nonexistent) company officer or employee, whose photograph was on the letter. There were several versions of the letter. All described the work being offered as stuffing envelopes at home. The letters differed in the announced rate of pay, which ranged from $1.40 to $2.76 for each envelope stuffed. Some of the letters said that the work originated from mail-order companies who needed workers but did not want to pay for the resulting labor costs. "If they hired more employees," those letters explained, "they would have to supervise them, rent more office space, pay more taxes, health insurance, liability insurance, workers' compensation, and all of this

involves more paperwork." Aplee. Supp. App. at 60, 75, 76. By using home workers these companies could pay up to $2.76 per envelope stuffed "and still save money." *Id.* Other versions of the letter stated that workers were needed as part of a company expansion into new markets "and we have literally hundreds of thousands of new customers who need to receive our circulars." *Id.* at 81, 96. Several versions stated that preaddressed, prestamped envelopes and prefolded circulars would be delivered to the responder's home to be stuffed. All versions of the letter directed responders to mail a registration fee of $25, which would later be doubly or triply refunded.

Those who sent the $25 fee received an acceptance letter notifying them that they had been accepted to stuff envelopes and instructing them to send a self-addressed stamped envelope and $1 for each of five different training shipments. The training materials told the responders to obtain a post office box and voice mail and to place advertisements similar to the ones they had answered. The ads were to include the phone number of a voice mail box, on which the participant was to record a two-minute script. When those who followed these directions ("participants") began receiving responses in their voice mail boxes, they were to send a packet of introductory materials similar to the ones they had received, requesting a $25 registration fee. When the fee was paid, they were to keep half for themselves and to forward the remaining $12.50 to the processing center. Participants made copies of an acceptance letter provided with the training

materials and mailed one to each new responder. The letter directed the responder to send money for training materials. The training materials lamely attempted to describe this process as what had been advertised:

> As we told you in the last Training and Orientation Shipment, in order to generate the Customer Response Envelopes you will be processing, **you** will place classified ads in publications anywhere in the United States. When the customers respond, these envelopes (pre-addressed and stamped) are sent directly to you at the mailing address you have selected. You stuff them with your pre-folded, free details circulars/application and seal them. You mail your completed envelopes. Next, the resulting cash remittances are sent directly to you for processing. Again, you will stuff an envelope with a Notice of Acceptance, which tells them that their paperwork has been received and is being processed.

Aplee. Supp. App. at 89 (second and third emphasis added).

A few participants moved up in the operation, acting as processing centers. Jacqueline Earls, at the direction of "Louis Allen,"continued working as a participant but also received the $12.50 checks remitted by other participants, who had kept half of each $25 application fee as their share. Retaining $5 for herself from each check, she deposited the remainder into a bank account from which "Allen" made withdrawals. She testified that she never sent envelopes to be stuffed to any of the applicants but was merely increasing the number of newspaper ads being placed. She eventually pleaded guilty to mail fraud.

Tamara Briscoe performed similar functions and spoke with "Mr. Allen" nearly every day. She ran ads, mailed out different versions of introductory letters describing the work either as stuffing envelopes for mail-order companies

or as helping the business expand into new markets, and received applications and money for training materials. She opened one bank account at "Mr. Allen's" direction and forwarded to him an ATM card. She deposited into this account $7.50 of each $12.50 check she received from participants; she kept the remaining $5 for herself. Also, at "Mr. Allen's" direction she opened a second bank account from which she made refunds. She eventually pleaded guilty to mail fraud.

Using the aliases Louis Allen and John Lawrence, Mr. Chavis also hired secretarial services to make bank deposits, to receive his mail, and to prepare documents to be mailed. Sonja Patillo testified that she was hired by such a service to collect the dollar bills responders sent in for the training materials. She also mailed training materials to responders in the self-addressed stamped envelopes they had provided, answered phone calls from responders, and tried "to appease them in some way" if they were unhappy with the scheme. Aplt. App. Vol. 1 at 706.

Some responders chose not to participate after receiving the training materials and seeing what the "business" entailed. Some requested refunds.

No envelopes or prefolded circulars were ever delivered to participants. The only items ever "stuffed" were the introductory letters, acceptance letters, and training materials that were mailed to responders and new participants, not materials for mail-order companies who needed workers. Participants were simply recruiting others to send in more money in a classic Ponzi or pyramid

scheme. Based on the records seized by postal inspectors from Ms. Briscoe and Ms. Earls, the government created two summary exhibits that calculated the number of applications (and their accompanying $25 checks) they had handled: 17,890 for Ms. Earls and 83,321 for Ms. Briscoe.

Mr. Chavis was arrested in mid-December 2003. The district court appointed June Tyhurst as his counsel on December 24, 2003, but he filed a waiver of counsel on December 31. After a series of hearings regarding his request to proceed pro se, the court granted the request on February 12, 2004. Although initially proposing that Ms. Tyhurst be cocounsel, the court appointed her as standby counsel. Several months later, on June 16, 2004, Gary Cantrell entered an appearance as Mr. Chavis's cocounsel and the court permitted Ms. Tyhurst to withdraw. Within a month, however, Mr. Cantrell filed a motion to withdraw as cocounsel; the court granted the request on August 23, 2004, and reappointed Ms. Tyhurst as standby counsel.

At trial the government called 28 witnesses, including Ms. Earls and Ms. Briscoe; six participants who had placed ads, received applications with $25 checks, and forwarded half the proceeds to a processing center; nine responders who declined to participate further after sending the $25 registration fee or an additional $5 for training materials; five people who provided secretarial services to Mr. Chavis; and one John Lawrence, whose name and social security number Mr. Chavis had misappropriated as an alias. Mr. Chavis did not testify or call any

witnesses. The jury delivered guilty verdicts on all counts. Mr. Chavis did not object to the findings in the presentence report, and the district court sentenced him to concurrent terms of 60 months' imprisonment on the conspiracy count and 292 months' imprisonment on the mail-fraud counts.

## II.  DISCUSSION

### A.  Denial of Counsel

Mr. Chavis contends that the district court violated his right to counsel by permitting Mr. Cantrell to withdraw. In his brief on appeal Mr. Chavis argued that he had a right to cocounsel. At oral argument, however, Mr. Chavis's attorney conceded that Mr. Chavis had no such right. *See United States v. McKinley*, 58 F.3d 1475, 1480 (10th Cir. 1995) ("[I]t is certainly true that there is no constitutional right to a hybrid form of representation."); *United States v. Hill*, 526 F.2d 1019, 1025 (10th Cir. 1975) ("The Sixth Amendment does not give any indication that hybrid representation is a right of constitutional dimensions. . . . [And] no statutory right of hybrid representation is accorded."). Instead, he argued that Mr. Chavis had relinquished his right to proceed pro se and had retained Mr. Cantrell as lead counsel. He cited *McKaskle v. Wiggins*, 465 U.S. 168 (1984), and *McKinley*, 58 F.3d at 1480, for the proposition that a pro se defendant may relinquish his right to self-representation if his standby counsel assumes control of the case. He contended that Mr. Chavis's retained counsel, Mr. Cantrell, did in fact assume control of the case and that by allowing

Mr. Cantrell to withdraw, the district court denied Mr. Chavis his right to counsel. We disagree.

In *McKaskle* a pro se defendant claimed that standby counsel had so interfered with his self-representation that he had been deprived of the right to conduct his own defense. *See* 465 U.S. at 173. The Supreme Court rejected the claim on the facts of the case, but recognized that a pro se defendant must have "a fair chance to present his case in his own way," *id.* at 177, and that there are limits that standby counsel must respect, *see id.* at 177-88. As for *McKinley*, the pertinent issue was simply whether the defendant had asked to proceed pro se or merely to participate as cocounsel; we held that he had requested to proceed pro se. *See* 58 F.3d at 1480-81.

Apparently what Mr. Chavis is suggesting is that (1) Mr. Cantrell had exceeded the limits on cocounsel's permissible exercise of authority in the case, so that Mr. Chavis had in essence relinquished his pro se representation; (2) the withdrawal of Mr. Cantrell therefore left Mr. Chavis without counsel; and (3) the court thus violated Mr. Chavis's right to counsel by allowing Mr. Cantrell to withdraw. This is an interesting argument in theory, but the first premise lacks factual support.

The relationship between a pro se defendant and cocounsel was described to Mr. Chavis by the district court early in the proceedings. On December 5, 2004, the following exchange occurred:

THE COURT:       The Court – we researched it very quickly – was trying to look at a circumstance where you would still be representing yourself, but where the counsel could be of more assistance to you, more of a co-counsel, or joint counsel.  That person wouldn't be your whipping boy, or girl, but you couldn't say, "Go do this, this, this," and they go do it.  That person, you are more in an equal posture as related to the case.

THE DEFENDANT:       They would be able to assist me on the rules of evidence and courtroom procedures?

THE COURT:       It would be more like a co-counsel situation.  You, as the Defendant, would participate certainly as your own counsel and as co-counsel, but you would still have the services of an appointed counsel in more than an advisory role.  But it would still be subject to your direct control in matters of strategy and how you wanted to examine witnesses, and other functions.

There is no Constitutional right to this kind of representation, but the Court is trying to create a circumstance which creates the least – which lessens an environment for error in the trial.

Would you be interested in this joint counsel, or co-counsel kind of thing?

. . .

THE DEFENDANT:       . . . I can't imagine why I would turn that down.

Aplt. App. Vol 1 at 27-28.

The bounds of authority for cocounsel were hardly approached, much less exceeded, in this case.  During the brief time that Mr. Cantrell was cocounsel, he filed no motions and did not appear in court as Mr. Chavis's representative.  In fact, the only documents in the record signed by Mr. Cantrell are his entry of

appearance and his request to withdraw. Mr. Chavis clearly requested the right to represent himself, and then retained Mr. Cantrell as his cocounsel, not lead counsel. He was undoubtedly "present[ing] his case in his own way." *McKaskle*, 465 U.S. at 177. He maintained ultimate control of the case, and proceeded pro se throughout. The district court did not violate Mr. Chavis's right to counsel by allowing Mr. Cantrell to withdraw and then appointing Ms. Tyhurst only as standby counsel.

**B.     Sufficiency of the Evidence**

Mr. Chavis argues that the evidence at trial was insufficient to support his convictions for mail fraud and conspiracy to commit mail fraud. Sufficiency of the evidence is a question of law that we review de novo, asking only "whether taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant[] guilty beyond a reasonable doubt." *United States v. Platte,* 401 F.3d 1176, 1180 (10th Cir. 2005) (internal quotation marks omitted).

To establish guilt under the mail-fraud statute, 18 U.S.C. § 1341, the government had to prove that (1) Mr. Chavis engaged in a scheme or artifice to defraud or to obtain money by means of false and fraudulent pretenses; (2) he did so with the intent to defraud; and (3) he "used the United States mails . . . to facilitate that scheme." *United States v. Rahseparian*, 231 F.3d 1267, 1271 (10th

Cir. 2000). Mr. Chavis argues only that the evidence was not sufficient to establish the second element, the intent to defraud. The argument is frivolous.

Mr. Chavis's "business" promised those who responded to the newspaper ads that they would earn money stuffing envelopes. This was a false promise. The business did not provide participants with either material to be stuffed (except for one form letter that the participants themselves had to copy for their mailings) or envelopes. Although participants put documents in self-addressed envelopes from their own victims, they were not being paid as described in the newspaper ads and acceptance letters. They were not performing the task for companies retaining their stuffing services (either mail-order firms or Mr. Chavis's own operation), and even Mr. Chavis did not argue at trial that he had provided any envelope-stuffing work. The "service" the participants were paid to provide was not stuffing envelopes but soliciting victims. Their pay was based on how many victims they recruited to send them money, not on how proficient they were at putting circulars in envelopes.

Witnesses described how Mr. Chavis controlled the entire operation. It was a natural, compelling inference for the jury to find that Mr. Chavis caused the promotional materials to be distributed with no intent to fulfill the promises made. *See Cleveland v. United States*, 531 U.S. 12, 19 (2000) (it is "unmistakable that the [mail-fraud statute] reach[s] false promises and misrepresentations as to the future." (internal quotation marks omitted)); *United States v. O'Malley*, 535

-11-

F.2d 589, 592 (10th Cir. 1976) (entering into agreement to sell with no intention of performing constitutes fraud within meaning of mail-fraud statute).  Moreover, as icing on the cake, witnesses testified to Mr. Chavis's various artifices to conceal his identity and involvement in the scheme.  Such attempts at concealment can establish fraudulent intent.  *See United States v. Welch*, 327 F.3d 1081, 1105 (10th Cir. 2003) ("Intent [to defraud] may be inferred from evidence that the defendant attempted to conceal activity." (internal quotation marks omitted)).  The evidence was sufficient for the jury to find beyond a reasonable doubt that Mr. Chavis intentionally defrauded his victims.

As for the conspiracy charge, the government must prove:  "(1) the defendant's agreement with another person to violate the law; (2) his knowledge of the essential objective of the conspiracy; (3) his knowing and voluntary involvement; and (4) interdependence among the alleged coconspirators."  *Rahseparian*, 231 F.3d at 1272.  "Stated simply," the charge "required the government to prove [he] had an explicit or implicit agreement with [his coconspirators] to commit mail fraud."  *Id*.

The only possible question regarding this charge is whether any of Mr. Chavis's associates realized that the enterprise was committing fraud; if they did not, they could not have been coconspirators.  *See United States v. Weidner*, 437 F.3d 1023, 1033 (10th Cir. 2006) (to establish guilt under § 371 "the government was required to prove that the two [coconspirators] agreed to [commit

fraud], and to knowingly engage in" the criminal activity).  But Ms. Earls and

Ms. Briscoe, both of whom pleaded guilty to mail fraud before testifying,

described their own involvement in terms that clearly showed their knowledge

that they were distributing false promises of envelope-stuffing jobs.  Based on

this evidence, a reasonable jury could have found beyond a reasonable doubt that

Mr. Chavis had an agreement with his coconspirators to commit mail fraud.

## C.    Good-Faith Instruction

A defendant is not guilty of mail fraud if he "in good faith believed that the

plan would succeed, that the promises made would be kept and the representations

carried out."  *United States v. Hopkins*, 744 F.2d 716, 718 (10th Cir. 1984) (en

banc).  At trial Mr. Chavis requested (but apparently did not tender) a good-faith

instruction.  The district court denied the request, ruling that there was

insufficient evidence in the record to support such an instruction.  The court cited

*United States v. Smith*, 13 F.3d 1421, 1426 (10th Cir. 1994), for the proposition

that "a benign explanation of only *some* of the acts is insufficient," and stated that

"[a]t best, that's what this Court finds that we have here."  Aplt. App. Vol. 4 at

1011 (emphasis added).  Mr. Chavis objected to the court's failure to give the

instruction, but he neither stated his reasons why the instruction should be given

nor gave any grounds for his objection to the court's decision not to give it:

> THE COURT:    Mr. Chavis, do you have any objections to the
> instructions for the record that this Court will
> give?

MR. CHAVIS:     No, I don't, Your Honor.

THE COURT:     Very well.

MR. CHAVIS:     You noted my objection to the lack of good faith?

THE COURT:     Right, I did.

Aplt. App. Vol. 4 at 1013.

Because Mr. Chavis's objection did not state the grounds on which it was based, we question whether he adequately preserved the issue. *See* Fed. R. Crim. P. 30(d). But we need not resolve that question because there was no error in denying the requested instruction.

This court is bound by its en banc decision that a defendant in a mail-fraud case is entitled to a good-faith instruction if he requests it and "there is sufficient evidence to support the theory." *Hopkins*, 744 F.2d 716 at 717.[1] To justify the

---

[1]Apparently, we are the only circuit to so hold. The other circuits to address the matter have held, at least as a practical matter, that a district court is not required to give a separate good-faith-defense instruction in a fraud case because a finding of the intent to defraud, which is an element of the crime, *see Rahseparian*, 231 F.3d at 1271, necessarily implies that there was no good faith. *See United States v. Dockray*, 943 F.2d 152, 155 (1st Cir. 1991) ("[W]here the court properly instructs the jury on the element of intent to defraud—essentially the opposite of good faith—a separate instruction on good faith is not required."); *United States v. McElroy*, 910 F.2d 1016, 1026 (2d Cir. 1990) (instruction to jury on "'intent to defraud' . . . conveyed the essence of a 'good faith defense' instruction"); *United States v. Gross*, 961 F.2d 1097, 1103 (3d Cir. 1992) ("[A] jury finding that the defendant has acted knowingly and wilfully is inconsistent with a finding that the defendant acted in good faith."); *United States v. Mancuso*, 42 F.3d 836, 847 (4th Cir. 1994) ("If the district court gives adequate instruction on specific intent, a separate instruction on good faith is not necessary."); *United States v. Upton*, 91 F.3d 677, 683 (5th Cir. 1996) (jury instruction on

(continued...)

-14-

instruction, the defendant's evidence "must have the capacity to rebut all evidence of false and misleading conduct, all failures to disclose that which should have been disclosed and all matters that deceive and were intended to deceive another." *Smith*, 13 F.3d at 1426. "A benign explanation of only some of

---

[1](...continued)

"'knowingly'" and "'willfully' . . . substantially covered" defendant's good-faith defense); *United States v. Mutuc*, 349 F.3d 930, 934 (7th Cir. 2003) ("[A] defendant is not entitled to a specific good faith instruction so long as, considering the instructions as a whole, the jury was adequately instructed upon his theory of defense. . . . It is self-evident that one with an intent to defraud does not act in good faith." (internal quotation marks and ellipsis omitted)); *United States v. Rushton*, 963 F.2d 272, 274 (9th Cir. 1992) ("[A] defendant is not entitled to a separate good faith instruction when the court adequately instructs on specific intent." (internal quotation marks omitted)); *United States v. Sirang*, 70 F.3d 588, 594 (11th Cir. 1995) ("[A] finding of specific intent to deceive categorically excludes a finding of good faith." (internal quotation marks omitted)); *United States v. Gambler*, 662 F.2d 834, 837 (D.C. Cir. 1981) (same). The Eighth Circuit has not expressly overruled its statement that a good-faith instruction is required, *see United States v. Casperson*, 773 F.2d 216, 223 (8th Cir. 1985) ("[T]his court has held that defendants are entitled to an instruction on good faith where one has been requested and evidence exists to support the theory."); but it has implicitly done so by holding that the requirement is satisfied by a proper specific-intent instruction, *see United States v. Sanders*, 834 F.2d 717, 719 (8th Cir. 1987) (good-faith instruction not needed if specific intent to defraud is required by the instructions given). Similarly, the Sixth Circuit, relying on the Fifth Circuit decision in *United States v. Goss*, 650 F.2d 1336, 1345 (5th Cir. 1981), has held that failure to give a requested good-faith instruction in a mail-fraud case is error, but the error is harmless when the specific-intent instruction "adequately informed the jury of the defendants' theory of the case, and properly placed the burden of proof of intent on the government." *United States v. McGuire*, 744 F.2d 1197, 1201-02 (6th Cir. 1984). (In later cases the Fifth Circuit has not spoken in terms of harmless error, but rather has simply held that a specific-intent instruction satisfactorily informs the jury of the defense. *See Upton*, 91 F.3d at 683; *United States v. Gray*, 751 F.2d 733, 735-36 (5th Cir. 1985).)

-15-

the acts is insufficient"; the defendant must "completely rebut evidence that he or she intended to defraud." *Id.* In particular, "[a] defendant's honest belief that a venture will ultimately succeed does not constitute good faith if, in carrying out the plan, he knowingly uses false representations or pretenses with intent to deceive." *United States v. Janusz*, 135 F.3d 1319, 1323 (10th Cir. 1998).

Mr. Chavis's claim of good faith is predicated on his assertions that he did not think he was committing mail fraud and that he thought he was actually helping participants. But he points to no evidence, nor does he even claim, that he honestly believed that he would fulfill the promise to provide envelope-stuffing jobs. Accordingly, he was not entitled to a good-faith instruction.

## D.    Sentencing

In *Booker v. United States*, 543 U.S. 220 (2005), the Supreme Court "held that mandatory application of the [Sentencing] Guidelines violates the Sixth Amendment when judge-found facts, other than those of prior convictions, are employed to enhance a sentence." *United States v. Gonzalez-Huerta*, 403 F.3d 727, 731 (10th Cir. 2005) (en banc). Mr. Chavis's trial was conducted in September 2004, before *Booker* but after the Supreme Court's decision in *Blakely v. Washington*, 542 U.S. 296 (2004), had cast doubt on whether a judge, rather than the jury, could find the facts necessary for enhancements under the Guidelines. Thus, after the jury returned its verdicts, the district court recessed to finalize the jury instructions for factfindings relating to sentencing. At the end of

-16-

the recess, Mr. Chavis announced to the court that he was waiving any involvement by the jury in the sentencing proceeding. Also, he did not object to the findings in the presentence report.

On appeal Mr. Chavis argues that the district court nevertheless erred in applying the Guidelines mandatorily. We have used the term "nonconstitutional *Booker* error" to categorize mandatory application of the Guidelines. *See United States v. Paxton*, 422 F.3d 1203, 1207 (10th Cir. 2005). Mr. Chavis did not raise this argument in district court, so our review is for plain error. *See Gonzalez-Huerta*, 403 F.3d at 732. Again, plain error is "(1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal quotation marks omitted).

On this issue the government concedes that the first two prongs of the plain-error test have been met, but argues that Mr. Chavis has not met the third or fourth prongs. We need not address the third prong of the plain-error test because Mr. Chavis cannot satisfy the fourth. *See id.* at 736. We have held that nonconstitutional *Booker* error does not satisfy the fourth prong if the sentence falls within the Guidelines range and "there is no record evidence to support a lower sentence" *Id.* at 738-39. We see no such record evidence. The district court did not commit plain error in sentencing Mr. Chavis.

## III.   CONCLUSION

We AFFIRM the judgment of the district court.